KINSELLA, WARDEN, *v.* UNITED STATES
EX REL. SINGLETON.

No. 22.   Argued October 22, 1959.—Decided January 18, 1960.

*Harold H. Greene* argued the cause for appellant. With him on the briefs were *Solicitor General Rankin, Assistant Attorney General White, Acting Assistant*

*Attorney General Ryan, William A. Kehoe, Jr., Peter S. Wondolowski, William M. Burch II* and *D. Robert Owen.*

*Frederick Bernays Wiener* argued the cause and filed a brief for appellee.

Mr. Justice Clark delivered the opinion of the Court.

This direct appeal tests the constitutional validity of peacetime court-martial trials of civilian persons "accompanying the armed forces outside the United States"[1] and charged with noncapital offenses under the Uniform Code of Military Justice, 10 U. S. C. § 802, 70A Stat. 37. Appellee contends that the dependent wife of a soldier can be tried only in a court that affords her the safeguards of Article III and of the Fifth and Sixth Amendments of the Constitution. The trial court held Article 2 (11) of the Code unconstitutional as applied to civilian dependents accompanying the armed forces overseas and charged with noncapital offenses, 164 F. Supp. 707, and the Government appealed. We noted probable jurisdiction and permitted appellee to proceed *in forma pauperis.* 359 U. S. 903.

The appellee is the mother of Mrs. Joanna S. Dial, the wife of a soldier who was assigned to a tank battalion of the United States Army. The Dials and their three children lived in government housing quarters at Baumholder, Germany. In consequence of the death of one of their children, both of the Dials were charged with

---

[1] Art. 2. "The following persons are subject to this chapter:

"(11) Subject to any treaty or agreement to which the United States is or may be a party or to any accepted rule of international law, persons serving with, employed by, or accompanying the armed forces outside the United States and outside the following: that part of Alaska east of longitude 172 degrees west, the Canal Zone, the main group of the Hawaiian Islands, Puerto Rico, and the Virgin Islands."

unpremeditated murder, under Article 118 (2) of the
Uniform Code of Military Justice.  Upon the Dials' offer
to plead guilty to involuntary manslaughter under Article
119 of the Code, both charges were withdrawn and new
ones charging them separately with the lesser offense
were returned.  They were then tried together before a
general court-martial at Baumholder.  Mrs. Dial chal-
lenged the jurisdiction of the court-martial over her but,
upon denial of her motion, pleaded guilty, as did her hus-
band.  Each was sentenced to the maximum penalty per-
mitted under the Code.  Their convictions were upheld
by the Court of Military Appeals, and Mrs. Dial was
returned to the United States and placed in the Federal
Reformatory for Women at Alderson, West Virginia.
Thereafter the appellee filed this petition for habeas
corpus and obtained Mrs. Dial's discharge from custody.
From this judgment the warden has appealed. 

As has been noted, the jurisdiction of the court-martial
was based upon the provisions of Article 2 (11) of the
Code.  The Congress enacted that article in an effort to
extend, for disciplinary reasons, the coverage of the Uni-
form Code of Military Justice to the classes of persons
therein enumerated.  The jurisdiction of the Code only
attached, however, when and if its applicability in a given
foreign territory was sanctioned under "any treaty or
agreement to which the United States is or may be a
party" with the foreign sovereignty, or under "any
accepted rule of international law."  The existence of
such an agreement here is admitted.  The constitution-
ality of Article 2 (11), as it applies in time of peace
to civilian dependents charged with noncapital offenses
under the Code, is the sole issue to be decided.

The question is not one of first impression, as we had
before us in 1956 the constitutionality of the article as
applied to civilian dependents charged with capital
offenses, in the companion cases of *Kinsella* v. *Krueger,*

351 U. S. 470, and *Reid* v. *Covert,* 351 U. S. 487. At the original submission of those cases, we decided by a bare majority that the article was a valid exercise of the power of the Congress, under Art. IV, § 3, to "make all needful Rules and Regulations" for the "Territories" of the United States. We held further that the "procedure in such tribunals need not comply with the standards prescribed by the Constitution for Article III courts," 351 U. S., at 475, and specifically upheld court-martial jurisdiction in such cases against the contention that its procedures did not provide for indictment by grand jury or trial by petit jury. In short, we said that the failure to provide such protections raised "no constitutional defect," citing *In re Ross,* 140 U. S. 453 (1891), and the *Insular Cases,* such as *Balzac* v. *Porto Rico,* 258 U. S. 298 (1922). After rehearing at the following Term, these opinions were withdrawn and judgments were entered declaring the article unconstitutional when applied to civilian dependents charged with capital offenses. *Reid* v. *Covert,* consolidated with *Kinsella* v. *Krueger,* 354 U. S. 1 (1957). The Court held [2] that the power over "Territories," as applied by the *In re Ross* doctrine, was neither applicable nor controlling. It found that trial by court-martial was the exercise of an exceptional jurisdiction springing from the power granted the Congress in Art. I, § 8, cl. 14, "To make Rules for the Government and Regulation of the land and naval Forces," as supplemented by the Necessary and Proper Clause of Art. I, § 8, cl. 18.[3] But as applied to the

---

[2] Four Justices joined in an opinion announcing the judgment, two concurred in the result, and two dissented. MR. JUSTICE WHITTAKER, having come to the Court subsequent to the time of argument and decision in this case, took no part.

[3] Clause 18. "To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."

civilian dependents there involved it must be considered, the Court said, in relation to Article III and the Fifth and Sixth Amendments. The majority concluded that, in those capital cases, trial by court-martial as provided could not constitutionally be justified.

The appellee contends that this result, declaring civilian dependents charged with capital offenses not to be subject to the provisions of the Code, bears directly on its applicability to the same class charged with non-capital crimes. She says that the test of whether civilian dependents come within the power of Congress as granted in Clause 14's limitation to the "land and naval Forces" is the status of the person involved. Her conclusion is that if civilian dependents charged with capital offenses are not within that language, *a fortiori,* persons in the same class charged with noncapital offenses cannot be included, since the clause draws no distinction as to offenses. The Government fully accepts the holding in the second *Covert* case, *supra.* It contends that the case is controlling only where civilian dependents are charged with capital offenses, and that in fact the concurrences indicate that considerations of a compelling necessity for prosecution by courts-martial of civilian dependents charged with noncapital offenses might permit with reason the inclusion of that limited category within court-martial jurisdiction. It submits that such necessities are controlling in the case of civilian dependents charged with noncapital crimes. It points out that such dependents affect the military community as a whole; that they have, in fact, been permitted to enjoy their residence in such communities on the representation that they are subject to military control; and that realistically they are a part of the military establishment. It argues that, from a morale standpoint, the present need for dependents to accompany American forces maintained abroad is a press-

ing one; that their special status as integral parts of the military community requires disciplinary control over them by the military commander;· that the effectiveness of this control depends upon a readily available machinery affording a prompt sanction and resulting deterrent present only in court-martial jurisdiction; and that not only is court-martial procedure inherently fair but there are no alternatives to it. The Government further contends that it has entered into international agreements with a large number of foreign governments permitting the exercise of military jurisdiction in the territory of the signatories, and pursuant to the same it has been utilizing court-martial procedures at various American installations abroad. Its legal theory is based on historical materials which it asserts indicate a well-established practice of court-martial jurisdiction over civilians accompanying the armed forces, during Colonial days as well as the formative period of our Constitution. From this it concludes that civilian dependents may be included as a necessary and proper incident to the congressional power "To make Rules for the Government and Regulation of the land and naval Forces," as granted in Clause 14.

In this field, *Toth v. Quarles,* 350 U. S. 11 (1955), cited with approval by a majority in the second *Covert* case, *supra,* is a landmark. Likewise, of course, we must consider the effect of the latter case on our problem.[4] We therefore turn to their teachings. The *Toth* case involved a discharged soldier who was tried by court-martial after his discharge from the Army, for an offense committed before his discharge. It was said there that the Clause 14 "provision itself does not empower Congress to deprive

---

[4] See also *Dynes v. Hoover,* 20 How. 65 (1857)·; *Ex parte Milligan,* 4 Wall. 2 (1866); *Duncan v. Kahanamoku,* 327 U. S. 304 (1946); and Winthrop, Military Law and Precedents (2d ed. 1896), 144 *et seq.* and Reprint (1920) 105-107.

people of trials under Bill of Rights safeguards," 350 U. S., at 21–22, and that military tribunals must be restricted "to the narrowest jurisdiction deemed absolutely essential to maintaining discipline among troops in active service," *id.*, at 22. We brushed aside the thought that "considerations of discipline" could provide an excuse for "*new expansion* of court-martial jurisdiction at the expense of the normal and constitutionally preferable system of trial by jury." *Id.*, at 22–23. (Italics supplied.) We were therefore "not willing to hold that power to circumvent those safeguards should be inferred through the Necessary and Proper Clause." *Id.*, at 22. The holding of the case may be summed up in its own words, namely, that "the power granted Congress 'To make Rules' to regulate 'the land and naval Forces' would seem to restrict court-martial jurisdiction to persons who are actually members or part of the armed forces." *Id.*, at 15.

It was with this gloss on Clause 14 that the Court reached the second *Covert* case, *supra*. There, as we have noted, the person involved was the civilian dependent of a soldier, who was accompanying him outside the United States when the capital offense complained of was committed. The majority concluded that "Trial by court-martial is constitutionally permissible *only* for persons who can, *on a fair appraisal*, be regarded as falling within the authority given to Congress under Article I to regulate the 'land and naval Forces' . . . ." Concurring opinion, 354 U. S., at 42.[5] (Italics supplied.) The test

---

[5] The second concurring opinion expressed the view that Article I was an unlimited grant of power to Congress "to make such laws in the regulation of the land and naval forces as are necessary to the proper functioning of those forces" and indicated that the Necessary and Proper Clause "modified" Clause 14 "expanding" its power "under changing circumstances." 354 U. S., at 68.

for jurisdiction, it follows, is one of *status,* namely, whether the accused in the court-martial proceeding is a person who can be regarded as falling within the term "land and naval Forces." The Court concluded that civilian dependents charged with capital offenses were not included within such authority, the concurring Justices expressing the view that they did not think "that the proximity, physical and social, of these women to the 'land and naval Forces' is, with due regard to all that has been put before us, so clearly demanded by the effective 'Government and Regulation' of those forces as reasonably to demonstrate a justification for court-martial jurisdiction over capital offenses." Concurring opinion, 354 U. S., at 46–47.

In the second *Covert* case, each opinion supporting the judgment struck down the article as it was applied to civilian dependents charged with capital crimes. The separate concurrences supported the judgment on the theory that the crime being "in fact punishable by death," *id.,* at 45, the question to be decided is "analogous, ultimately, to issues of due process," *id.,* at 75. The Justices joining in the opinion announcing the judgment, however, did not join in this view, but held that the constitutional safeguards claimed applied in *"all* criminal trials" in Article III courts and applied "outside of the States," pointing out that both the Fifth and Sixth Amendments were "all inclusive with their sweeping references to 'no person' and to 'all criminal prosecutions.' " *Id.,* at 7–8. The two dissenters [6] found "no distinction in the Constitution between capital and other cases," *id.,* at 89, but said that the constitutional safeguards claimed were not required under the power granted Congress in Art. IV, § 3, and the cases heretofore mentioned. The

---

[6] The writer of this opinion wrote the dissent.

briefs and argument in *Covert* reveal that it was argued and submitted by the parties on the theory that no constitutional distinction could be drawn between capital and noncapital offenses for the purposes of Clause 14. Supplemental Brief for Government on Rehearing, Nos. 701 and 713, at pp. 16–20, 82–95.

We have given careful study to the contentions of the Government. They add up to a reverse of form from the broad presentation in *Covert,* where it asserted that no distinction could be drawn between capital and noncapital offenses. But the same fittings are used here with only adaptation to noncapital crimes. The Government asserts that the second *Covert* case, rather than foreclosing the issue here, indicates that military tribunals would have jurisdiction over civilian dependents charged with offenses less 'than capital. It says that the trial of such a person for a noncapital crime is "significantly different" from his trial for a capital one, that the maintaining of different standards or considerations in capital cases is not a new concept, and that, therefore, there must be a fresh evaluation of the necessities for court-martial jurisdiction and a new balancing of the rights involved. As we have indicated, these necessities add up to about the same as those asserted in capital cases and which the concurrence in second *Covert* held as not of sufficient "proximity, physical and social . . . to the 'land and naval Forces' . . . as reasonably to demonstrate a justification" for court-martial prosecution. Likewise in the Government's historical material—dealing with court-martial jurisdiction during peace—which was found in *Covert* "too episodic, too meager . . . for constitutional adjudication," concurring opinion, 354 U. S., at 64, it has been unable to point out one court-martial which drew any distinction, insofar as the grant of power to the Congress under Clause 14 was concerned, between

capital and noncapital crimes.[7] The Government makes no claim that historically there was ever any distinction made as to the jurisdiction of courts-martial to try civilian dependents on the basis of capital as against noncapital offenses. Without contradiction, the materials furnished show that military jurisdiction has always been based on the "status" of the accused, rather than on the nature of the offense. To say that military jurisdiction "defies definition in terms of military 'status'" is to defy unambiguous language of Art. I, § 8, cl. 14, as well as the historical background thereof and the precedents with reference thereto.[8]

Furthermore, we are not convinced that a critical impact upon discipline will result, as claimed by the Government (even if anyone deemed this a relevant consideration), if noncapital offenses are given the same treatment as capital ones by virtue of the second *Covert* case. The same necessities claimed here were found

---

[7] Even at argument here government counsel admitted he had found no such distinction other than that asserted by the concurrences in second *Covert:*

Mr. Justice Black: "What is the historical difference as to the 'Members of the land and naval Forces' and the constitutional power of Congress dependent upon whether they are capital crimes or noncapital crimes? When did that distinction first come into existence?"

Mr. Davis: "Well, I think that distinction was first articulated in the concurring opinions in the *Covert* case."

Mr. Justice Black: "I really asked you about the history because I was curious to know [whether], in your reading and so forth, you found any reference to that distinction in this field before the *Covert* case."

Mr. Davis: "No. No explicit reference Mr. Justice Black."

[8] It was for this reason that the majority in the first *Covert* case, *supra,* based its decision on Art. IV, § 3, rather than the congressional power under Clause 14.

244

present in the second *Covert* case (see the dissent there) and were rejected by the Court. Even if the necessity for court-martial jurisdiction be relevant in cases involving deprivation of the constitutional rights of civilian dependents, which we seriously question, we doubt that the existence of the small number of noncapital cases now admitted by the Government in its brief here,[9] when spread over the world-wide coverage of military installations, would of itself bring on such a crisis. Moreover, in the critical areas of occupation, other legal grounds may exist for court-martial jurisdiction as claimed by the Government in No. 37, *Wilson* v. *Bohlender, post,* p. 281. See *Madsen* v. *Kinsella,* 343 U. S. 341 (1952). Another serious obstacle to permitting prosecution of noncapital offenses, while rejecting capital ones, is that it would place in the hands of the military an unreviewable discretion to exercise jurisdiction over civilian dependents simply by downgrading the offense, thus stripping the accused of his constitutional rights and protections. By allowing this assumption of "the garb of mercy," [10] we would be depriving a capital offender of his

---

[9] Aside from traffic violations, there were only 273 cases (both capital and noncapital) involving dependents subject to foreign jurisdiction during the period between December 1, 1954, and November 30, 1958. This number includes 54 "Offenses against economic control laws" and 88 offenses denominated "other." Government's Brief on the Merits in *McElroy* v. *Guagliardo,* No. 21, at p. 75.

[10] "He was glad, he said, that the penalty under this bill was not to be greater than that to which persons were subjected who were convicted of counterfeiting the great seal; but, on the other hand, he feared that this seeming lenity was not what it appeared to be, the child of mercy; he apprehended that its object was to facilitate the conviction of the accused, by taking from him the means of defence, which he might claim as his right, if the bill left the enumerated acts within the statute of the 25th of Edward III. These acts might be considered as proofs of an adherence to the king's enemies, and consequently came within the species of treason on which corruption of blood attached; but, by classing them under

constitutional means of defense and in effect would nullify the second *Covert* case. This situation will be aggravated by the want of legislation providing for trials in capital cases in Article III courts sitting in the United States. At argument, the Government indicated that there had been no effort in the Congress to make any provision for the prosecution of such cases either in continental United States or in foreign lands. Still we heard no claim that the total failure to prosecute capital cases against civilian dependents since the second *Covert* decision in 1957 had affected in the least the discipline at armed services installations. We do know that in one case, *Wilson* v. *Girard,* 354 U. S. 524 (1957), the Government insisted and we agreed that it had the power to turn over an American soldier to Japanese civil authorities for trial for an offense committed while on duty. We have no information as to the impact of that trial on civilian dependents. Strangely, this itself might

---

the head of treasons which did not operate a corruption of blood, the framers of the bill had contrived to take from the accused the means of defence, under the appearance of lenity. Of all the characters of cruelty, he considered that as the most odious which assumed the garb of mercy: such was the case here; under the pretence of mercy to the accused, in not charging him with corruption of blood, he was to be deprived of the means of making his defence. That he might not stand a chance in the contest, his shield was to be taken from him. The list of the jury, to give him the benefit of the challenge—the list of witnesses, to enable him to detect conspiracies and to prevent perjury—the copy of the charge ten days before the trial, to enable him to prepare himself for the awful day—the assistance of a learned gentleman to speak for an unlearned man—all the arms and means of protection with which the humanity of the law of England had fortified an individual, when accused by the crown, were to be taken away. Harshness and severity were to be substituted for tenderness and compassion; and then he was to be insulted by being told he was spared the corruption of blood!" 5 The Speeches of the Right Hon. Charles James Fox in the House of Commons (London 1815) 78.

prove to be quite an effective deterrent. Moreover, the immediate return to the United States permanently of such civilian dependents, or their subsequent prosecution in the United States for the more serious offenses when authorized by the Congress, might well be the answer to the disciplinary problem. Certainly such trials would not involve as much expense nor be as difficult of successful prosecution as capital offenses.

We now reach the Government's suggestion that, in the light of the noncapital nature of the offense here, as opposed to the capital one in the *Covert* case, we should make a "fresh evaluation and a new balancing." But the power to "make Rules for the Government and Regulation of the land and naval Forces" bears no limitation as to offenses. The power there granted includes not only the creation of offenses but the fixing of the punishment therefor. If civilian dependents are included in the term "land and naval Forces" at all, they are subject to the full power granted the Congress therein to create capital as well as noncapital offenses. This Court cannot diminish and expand that power, either on a case-by-case basis or on a balancing of the power there granted Congress against the safeguards of Article III and the Fifth and Sixth Amendments. Due process cannot create or enlarge power. See *Toth* v. *Quarles, supra.* It has to do, as taught by the Government's own cases,[11] with the denial of that "fundamental fairness, shocking to the universal sense of justice." *Betts* v. *Brady,* 316 U. S. 455, 462 (1942). It deals neither with power nor with jurisdiction, but with their exercise. Obviously Fourteenth Amendment cases dealing with state action have no application here, but if they did, we believe that to deprive civilian dependents of the safeguards of a jury trial here, an

[11] *Powell* v. *Alabama,* 287 U. S. 45 (1932), and *Betts* v. *Brady,* 316 U. S. 455 (1942), both Fourteenth Amendment cases which would, of course, have no application here.

infamous case by constitutional standards, would be as invalid under those cases as it would be in cases of a capital nature. Nor do we believe that due process considerations bring about an expansion of Clause 14 through the operation of the Necessary and Proper Clause. If the exercise of the power is valid it is because it is granted in Clause 14, not because of the Necessary and Proper Clause. The latter clause is not itself a grant of power, but a *caveat* that the Congress possesses all the means necessary to carry out the specifically granted "foregoing" powers of § 8 "and all other Powers vested by this Constitution. . . ." As James Madison explained, the Necessary and Proper Clause is "but merely a declaration, for the removal of all uncertainty, that the means of carrying into execution those [powers] otherwise granted are included in the grant." VI Writings of James Madison, edited by Gaillard Hunt, 383. There can be no question but that Clause 14 grants the Congress power to adopt the Uniform Code of Military Justice. Our initial inquiry is whether Congress can include civilian dependents within the term "land and naval Forces" as a proper incident to this power and necessary to its execution. If answered in the affirmative then civilian dependents are amenable to the Code. In the second *Covert* case, *supra,* it was held they were not so amenable as to capital offenses. Our final inquiry, therefore, is narrowed to whether Clause 14, which under the second *Covert* case has been held not to include civilian dependents charged with capital offenses, may now be expanded to include civilian dependents who are charged with noncapital offenses. We again refer to James Madison:

> "When the Constitution was under the discussions which preceded its ratification, it is well known that great apprehensions were expressed by many, lest the omission of some positive exception, from the powers

248

delegated, of certain rights, . . . might expose them to the danger of being drawn, by construction, within some of the powers vested in Congress, more especially of the power to make all laws necessary and proper for carrying their other powers into execution. In reply to this objection, it was invariably urged to be a fundamental and characteristic principle of the Constitution, that all powers not given by it were reserved; that no powers were given beyond those enumerated in the Constitution, and such as were fairly incident to them; . . . ." Writings, *supra,* at 390.

We are therefore constrained to say that since this Court has said that the Necessary and Proper Clause cannot expand Clause 14 so as to include prosecution of civilian dependents for capital crimes, it cannot expand Clause 14 to include prosecution of them for noncapital offenses.

Neither our history nor our decisions furnish a foothold for the application of such due process concept as the Government projects. Its application today in the light of the irreversibility of the death penalty would free from military prosecution a civilian accompanying or employed by the armed services who committed a capital offense, while the same civilian could be prosecuted by the military for a noncapital crime. It is illogical to say that "the power respecting the land and naval forces encompasses . . . all that Congress may appropriately deem 'necessary' for their good order" and still deny to Congress the means to exercise such power through the infliction of the death penalty. But that is proposed here. In our view this would militate against our whole concept of power and jurisdiction. It would likewise be contrary to the entire history of the Articles of War. Even prior to the Constitutional Convention, the Articles of War included 17 capital offenses applicable to all persons whose status brought them within the term "land

and naval Forces." There were not then and never have been any exceptions as to persons in the applicability of these capital offenses. In 1806 when the Articles of War were first revised, Congress retained therein 16 offenses that carried the death penalty, although there was complaint that "almost every article in the bill was stained with blood." 15 Annals of Cong. 326.

Nor do we believe that the exclusion of noncapital offenses along with capital ones will cause any additional disturbance in our "delicate arrangements with many foreign countries." The Government has pointed to no disruption in such relations by reason of the second *Covert* decision. Certainly this case involves no more "important national concerns into which we should be reluctant to enter" than did *Covert*. In truth the problems are identical and are so intertwined that equal treatment of capital and noncapital cases would be a palliative to a troubled world.

We therefore hold that Mrs. Dial is protected by the specific provisions of Article III and the Fifth and Sixth Amendments and that her prosecution and conviction by court-martial are not constitutionally permissible. The judgment must therefore be

*Affirmed.*

MR. JUSTICE HARLAN, whom MR. JUSTICE FRANKFURTER joins, dissenting in Nos. 22, 21, and 37, and concurring in No. 58.▌

Within the compass of "any treaty or agreement to which the United States is or may be a party" and "any accepted rule of international law," Article 2 (11) of the Uniform Code of Military Justice makes subject to the

Code, and therefore prosecutable by courts-martial for offenses committed abroad, all "persons serving with, employed by, or accompanying the armed forces" outside the United States and certain other areas.[1]

These four cases, involving persons and crimes concededly covered by the Military Code, bring before us the constitutionality of Article 2 (11) as applied to (1) civilian service dependents charged with noncapital offenses (No. 22); (2) civilian service employees, also charged with noncapital offenses (Nos. 21 and 37);[2] and (3) civilian service employees charged with capital offenses (No. 58). In each instance the Court holds the Act unconstitutional. While I agree with the judgment in No. 58, which involves a capital offense, I cannot agree with the judgments in Nos. 22, 21 and 37, in each of which the conviction was for a noncapital offense.

The effect of these decisions is to deny to Congress the power to give the military services, when the United States is not actually at war, criminal jurisdiction over noncapital offenses committed by nonmilitary personnel while accompanying or serving with our armed forces abroad. I consider this a much too narrow conception of the constitutional power of Congress and the result particularly unfortunate in the setting of the present-day international scene. To put what the Court has decided in proper context, some review of the past fate of Article 2 (11) in this Court is desirable.

At the 1955 Term there came before the Court in *Kinsella* v. *Krueger,* 351 U. S. 470, and *Reid* v. *Covert,*

---

[1] To wit: "that part of Alaska east of longitude 172 degrees west, the Canal Zone, the main group of the Hawaiian Islands, Puerto Rico, and the Virgin Islands."

[2] In No. 37 the Government, alternatively, relies on the "War Power," the offense having been committed in the American Occupied Zone of West Berlin. Cf. *Madsen* v. *Kinsella,* 343 U. S. 341. Apart from whether or not the contention is available in light of the course of the proceedings below, I do not reach that issue.

351 U. S. 487, the question whether two army wives could be constitutionally convicted, under Article 2 (11), of the capital offense of first degree murder, committed while stationed with their husbands at military bases abroad. Initially a divided Court, in two opinions which I joined, upheld the convictions.[3] In so holding the Court relied not upon the constitutional power of Congress "To make Rules for the Government and Regulation of the land and naval Forces," Art. I, § 8, cl. 14, but upon *In re Ross,* 140 U. S. 453, the so-called *Insular Cases, e. g., Balzac* v. *Porto Rico,* 258 U. S. 298, and Art. IV, § 3, of the Constitution, respecting congressional power over Territories. These factors, in combination, led the Court to conclude that the constitutional guarantees of Article III and the Fifth and Sixth Amendments did not apply to criminal trials of Americans abroad before legislatively established tribunals; that it was permissible for Congress to conclude that persons circumstanced as those women were should be tried before a court-martial, rather than a civil tribunal; and that such trials did not offend the fundamentals of due process.

The decisions in these cases were reached under the pressures of the closing days of the Term. See 351 U. S., at 483–486. Having become convinced over the summer that the grounds on which they rested were untenable, I moved at the opening of the 1956 Term that the cases be reheard, being joined by the four Justices who had been in the minority. See 352 U. S. 901, 354 U. S. 1, 65–67.[4]

---

[3] In addition to myself, the majority opinions, written by MR. JUSTICE CLARK, were joined by JUSTICES REED, BURTON and MINTON. 351 U. S. 470 and 487. THE CHIEF JUSTICE and JUSTICES BLACK and DOUGLAS dissented. *Id.,* at 485. MR. JUSTICE FRANKFURTER filed a Reservation. *Id.,* at 481.

[4] The three remaining members of the original majority were in dissent, 352 U. S., at 902, MR. JUSTICE MINTON having meanwhile retired. MR. JUSTICE BRENNAN, his successor, did not participate on the motion.

Upon a consolidated rehearing of the cases, the Court's original opinions and the judgments of conviction were set aside, a majority of the Court then holding that whether the convictions should stand or fall depended solely on the Art. I, § 8, cl. 14 power, and that such power could not be constitutionally applied in those cases. *Reid* v. *Covert,* 354 U. S. 1. There was, however, no opinion for the Court. Four Justices joined in an opinion broadly holding that "civilians" can never be criminally tried by military courts in times of peace, *id.,* at 3–41.[5] Two Justices concurred specially in the result, on the narrow ground that Article 2 (11) could not be so applied to civilian service dependents charged with capital offenses, explicitly reserving judgment, however, as to whether nonmilitary personnel charged with other than capital offenses could be subjected to such trials.[6] *Id.,* at 41–64, 65–78. Two Justices dissented, adhering to the grounds expressed in the earlier majority opinions.[7] *Id.,* at 78. And one Justice did not participate in the cases.[8]

Thus the only issue that second *Covert* actually *decided* was that Article 2 (11) could not be constitutionally applied to civilian service dependents charged with capital offenses. Nevertheless, despite the wide differences of views by which this particular result was reached— none of which commanded the assent of a majority of the Court—*Covert* is now regarded as establishing that nonmilitary personnel are never within the reach of the Article I power in times of peace. On this faulty view of the case, it is considered that *Covert* controls the issues presently before us. Apart from that view I think it fair

---

[5] THE CHIEF JUSTICE, MR. JUSTICE BLACK (the writer of the opinion), and JUSTICES DOUGLAS and BRENNAN.

[6] MR. JUSTICE FRANKFURTER and myself.

[7] JUSTICES CLARK and BURTON.

[8] MR. JUSTICE WHITTAKER, succeeding MR. JUSTICE REED who had meanwhile retired.

to say different results might well have been reached in the three noncapital cases now under consideration. Without needlessly traversing ground already covered in my separate opinion in *Covert, id.,* at 67–78, I shall give my reasons for believing that while the result reached by the Court in the capital case is right, its decisions in the noncapital cases are wrong.

·*First.* The Court's view of the effect of *Covert* in these noncapital cases stems from the basic premise that only persons occupying a military "status" are within the scope of the Art. I, § 8, cl. 14 power. The judgment in *Covert* having decided that civilian service dependents were not within the reach of that power in capital cases, it is said to follow that such dependents, and presumably all other "civilians," may also not be tried by courts-martial in noncapital cases; this because neither the statute nor Article I makes exercise of the power turn upon the nature of the offense involved.

I think the "status" premise on which the Court has proceeded is unsound. Article I, § 8, cl. 14, speaks not in narrow terms of soldiers and sailors, but broadly gives. Congress power to prescribe "Rules for the Government and Regulation of the land and naval Forces." [9] This power must be read in connection with Clause 18 of the same Article, authorizing Congress

> "To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."

Thus read, the power respecting the land and naval forces encompasses, in my opinion, all that Congress may appropriately deem "necessary" for their good order. It

---

[9] The Fifth Amendment excepts from its protection "cases arising," not persons, "in the land or naval forces."

does not automatically exclude the regulation of non-military personnel.

I think it impermissible to conclude, as some of my brethren have indicated on an earlier occasion (see second *Covert, supra,* at 20–22), and as the Court now holds, *ante,* p. 248, that the Necessary and Proper Clause may not be resorted to in judging constitutionality in cases of this type. The clause, itself a part of Art. I, § 8, in which the power to regulate the armed forces is also found, applies no less to that power than it does to the other § 8 congressional powers, and indeed is to be read "as an integral part of each" such power. Second *Covert, supra,* at 43 (concurring opinion of FRANKFURTER, J.). As Mr. Justice Brandeis put it in *Jacob Ruppert* v. *Caffey,* 251 U. S. 264, at 300–301:

> "Whether it be for purposes of national defense, or for the purpose of establishing post offices and post roads or for the purpose of regulating commerce among the several States Congress has the power 'to make all laws which shall be necessary and proper for carrying into execution' the duty so reposed in the Federal Government. While this is a Government of enumerated powers it has full attributes of sovereignty within the limits of those powers. *In re Debs,* 158 U. S. 564. Some confusion of thought might perhaps have been avoided, if, instead of distinguishing between powers by the terms express and implied, the terms specific and general had been used. For the power conferred by clause 18 of § 8 'to make all laws which shall be necessary and proper for carrying into execution' powers specifically enumerated is also an express power. . . ."

See also *United States* v. *Classic,* 313 U. S. 299, 320.

Of course, the Necessary and Proper Clause cannot be used to "expand" powers which are otherwise constitu-

tionally limited, but that is only to say that when an asserted power is not appropriate to the exercise of an express power, to which all "necessary and proper" powers must relate, the asserted power is not a "proper" one. But to say, as the Court does now, that the Necessary and Proper Clause "is not itself a grant of power" is to disregard Clause 18 as one of the enumerated powers of § 8 of Art. I.

Viewing Congress' power to provide for the governing of the armed forces in connection with the Necessary and Proper Clause, it becomes apparent, I believe, that a person's "status" with reference to the military establishment is but one, and not alone the determinative, factor in judging the constitutionality of a particular exercise of that power. By the same token, the major premise on which the Court ascribes to *Covert* a controlling effect in these noncapital cases disappears.

*Second.* It is further suggested that the difference between capital and noncapital offenses is not constitutionally significant, and that if Article 2 (11) of the Military Code, as applied to nonmilitary persons, is unconstitutional in one case, it equally is so in the other. I think this passes over too lightly the awesome finality of a capital case, a factor which in other instances has been reflected both in the constitutional adjudications of this Court and in the special procedural safeguards which have been thrown around those charged with such crimes.

Thus, this Court has held that the Fourteenth Amendment requires a State to appoint counsel for an indigent defendant in a capital case, *Powell* v. *Alabama,* 287 U. S. 45, whereas in noncapital cases a defendant has no such absolute right to counsel, *Betts* v. *Brady,* 316 U. S. 455. Again, the Congress in first degree murder cases has in effect put infliction of the death penalty in the hands of the jury, rather than the judge, 18 U. S. C. § 1111 (b); see also 60 Stat. 766, as amended, 42 U. S. C. § 2274 (a).

and various States have similar statutes.[10]    Further illustrations of the same concern about capital cases are the prohibition on acceptance of pleas of guilty in such cases,[11] and, in the appellate field, provisions for mandatory or automatic appeals from such convictions.[12]

In my *Covert* opinion I pointed out that the Government itself had in effect acknowledged that because of the gravity of the offense, a treason case against a nonsoldier in time of peace could not constitutionally be held to be within the otherwise unlimited scope of Article 2 (11); and I expressed the view that the same constitutional limitation should obtain whenever the death penalty is involved.   354 U. S., at 77.   I see no reason for retreating from that conclusion.   The view that we must hold that nonmilitary personnel abroad are subject to peace-time court-martial jurisdiction either for all offenses, or for none at all, represents an inexorable approach to constitutional adjudication to which I cannot subscribe.

It is one thing to hold that nonmilitary personnel situated at our foreign bases may be tried abroad by courts-martial in times of peace for noncapital offenses, but quite another to say that they may be so tried where life is at stake.   In the latter situation I do not believe that the Necessary and Proper Clause, which alone in cases like this brings the exceptional Article I jurisdiction into play, can properly be taken as justifying the trial of nonmilitary personnel without the full protections of an Article III court.  See 354 U. S., at 77.   Before the constitutional existence of such a power can be found, for me a much more persuasive showing would be required that Congress had good reason for concluding that such a course is necessary to the proper maintenance of our military estab-

---

[10] *E. g.,* Mass. Gen. Laws Ann., c. 265, § 2; Miss. Code Ann., § 2536; N. H. Rev. Stat. Ann., c. 585, § 4.

[11] *E. g.,* N. Y. Code Crim. Proc., § 332.

[12] *E. g.,* Cal. Penal Code, § 1239 (b); Ore. Rev. Stat., § 138.810.

lishment abroad than has been made in any of the cases of this kind which have thus far come before the Court.

*Third.* I revert to the Court's "status" approach to the power of Congress to make rules for governing the armed forces. How little of substance that view holds appears when it is pointed out that had those involved in these cases been inducted into the army, though otherwise maintaining their same capacities, it would presumably have been held that they were all fully subject to Article 2 (11). Yet except for this formality their real "status" would have remained the same.

Although it was recognized in the second *Covert* case that a person might be subject to Article 2 (11) "even though he had not formally been inducted into the military or did not wear a uniform," 354 U. S., at 23, I think that drawing a line of demarcation between those who are constitutionally subject to the Art. I, § 8, cl. 14 power, and those who are not, defies definition in terms of military "status." I believe that the true issue on this aspect of all such cases concerns the closeness or remoteness of the relationship between the person affected and the military establishment. Is that relationship close enough so that Congress may, in light of all the factors involved, appropriately deem it "necessary" that the military be given jurisdiction to deal with offenses committed by such persons?

I think that such relationship here was close enough, and in this respect can draw no constitutional distinction between the army wife in No. 22 and the civilian service employees in the other cases. Though their presence at these army overseas bases was for different reasons and purposes, the relationship of both to the military community was such as to render them constitutionally amenable to the Article 2 (11) jurisdiction. By the same token, being of the view that the constitutional existence of such jurisdiction has not been shown as to civilian

service dependents charged with capital offenses, I am equally of the opinion that it cannot be found with respect to civilian service employees similarly charged. For these reasons I concur in the judgment of the Court in No. 58.

*Fourth.* The other factors which must be weighed in judging the constitutionality of Article 2 (11) as applied to noncapital cases have, in my opinion, been adequately satisfied. I need not add to what was said in my concurring opinion in *Covert*, 354 U. S., at 70–73, 76–77, with reference to the matters which originally were adumbrated by my Brother CLARK in his dissent in the same case. *Id.*, at 83–88. Nothing in the supplemental historical data respecting courts-martial which have been presented in these cases persuades me that we would be justified in holding that Congress' exercise of its constitutional powers in this area was without a rational and appropriate basis, so far as noncapital cases are concerned. Although it is now suggested that the problem with which Congress sought to deal in Article 2 (11) may be met in other ways, I submit that once it is shown that Congress' choice was not excluded by a rational judgment concerned with the problem it is beyond our competence to find constitutional command for other procedures.

I think it unfortunate that this Court should have found the Constitution lacking in enabling Congress to cope effectively with matters which are so intertwined with broader problems that have been engendered by present disturbed world conditions. Those problems are fraught with many factors that this Court is ill-equipped to assess, and involve important national concerns into which we should be reluctant to enter except under the clearest sort of constitutional compulsion. That such compulsion is lacking here has been amply demonstrated by the chequered history of the past cases

of this kind in the Court. Today's decisions are the more regrettable because they are bound to disturb delicate arrangements with many foreign countries, and may result in our having to relinquish to other nations where United States forces are stationed a substantial part of the jurisdiction now retained over American personnel under the Status of Forces Agreements.

I would reverse in Nos. 22, 21, and 58, and affirm in No. 37.

MR. JUSTICE WHITTAKER, with whom MR. JUSTICE STEWART joins, concurring in part and dissenting in part.

In No. 22, one Joanna Dial (whose cause is prosecuted here by respondent Singleton), an American civilian wife accompanying her husband, an American soldier serving in Germany, was there tried and convicted in 1957 by a general court-martial for manslaughter in violation of Article 119 of the Uniform Code of Military Justice,[1] 10 U. S. C. § 919, and was sentenced to imprisonment for a term of three years. In No. 21, respondent Guagliardo, an American civilian employed as an electrical lineman by the United States Air Force at Nouasseur Air Depot in Morocco, was there tried and convicted in 1957 by a general court-martial for conspiring to commit larceny from the stores of the Air Force in violation of Article 81 of the Code, 10 U. S. C. § 881, and was sentenced to imprisonment for a term of three years. In No. 37, petitioner Wilson, an American civilian employed as an auditor by the United States Army in Berlin, Germany, was there tried and convicted in 1956 by a general court-

---

[1] The Uniform Code of Military Justice, 70A Stat. 36 *et seq.*, will hereafter, for brevity, be called the "Code."

martial for three acts of sodomy committed upon military personnel in violation of Article 134 of the Code, 50 U. S. C. § 728, and was sentenced to imprisonment for a term of five years. In No. 58, petitioner Grisham, an American civilian employed as a cost accountant by the United States Army Corps of Engineers in Orleans, France, was there tried by a general court-martial for the capital offense of premeditated murder and convicted of the lesser included offense of unpremeditated murder in violation of Article 118 of the Code, 50 U. S. C. § 712, and was sentenced, as reduced by clemency action of the Secretary of the Army, in 1957, to imprisonment for a term of 35 years.

Each of the accused persons objected to trial by court-martial upon the ground that it had no jurisdiction to try him. After their convictions, sentences, and return to the United States, each sought release by habeas corpus in a Federal District Court. Two were successful—Singleton (164 F. Supp. 707, D. C. S. D. W. Va.) and Guagliardo (104 U. S. App. D. C. 112, 259 F. 2d 927)—but the other two were not—Wilson (167 F. Supp. 791, D. C. Colo.) and Grisham (261 F. 2d 204, C. A. 3d Cir.)—and the four cases were brought here for review.

These cases fall into three categories. No. 22, the *Singleton* case, involves a civilian dependent tried for a noncapital offense; Nos. 21 and 37, the *Guagliardo* and *Wilson* cases, involve civilian employees of the military tried for noncapital offenses, and No. 58, the *Grisham* case, involves a civilian employee of the military tried for a capital offense. Each claims that, being a civilian, he was not constitutionally subject to trial by court-martial but, instead, could constitutionally be tried by the United States only in an Article III court, upon an indictment of a grand jury under the Fifth Amendment, and by an impartial petit jury under the Sixth Amendment to the Constitution.

The cases present grave questions and, for me at least, ones of great difficulty. Our recent decision in *Reid* v. *Covert*, 354 U. S. 1, makes clear that the United States Constitution extends beyond our territorial boundaries and reaches to and applies within all foreign areas where jurisdiction is or may be exercised by the United States over its citizens—that when the United States proceeds against its citizens abroad "[i]t can only act in accordance with all the limitations imposed by the Constitution." 354 U. S., at 6.

The broad question presented, then, is whether our Constitution authorizes trials and punishments by courts-martial in foreign lands in time of peace of civilian dependents "accompanying" members of the armed forces and of civilians "employed by" the armed forces, for conduct made an offense by the Uniform Code of Military Justice, whether capital or noncapital in character.

The source of the power, if it exists, is Art. I, § 8, cl. 14, of the Constitution.[2] It provides:

"The Congress shall have power . . .

"To make Rules for the Government and Regulation of the land and naval Forces."

Pursuant to that grant of power, Congress by the Act of August 10, 1956, c. 1041, 70A Stat. 36 *et seq.*—revising the pre-existing Articles of War—enacted the Uniform

---

[2] This does not overlook the "Necessary and Proper" Clause, Art. I, § 8, cl. 18, of the Constitution, but, in my view, that Clause, though applicable, adds nothing to Clause 14, because the latter Clause, empowering Congress "To make Rules for the Government and Regulation of the land and naval Forces," plainly means *all necessary and proper rules* for those purposes.

MR. JUSTICE STEWART is of the view that Clause 14 must be read in connection with the "Necessary and Proper" Clause, and agrees with the views expressed in MR. JUSTICE HARLAN's separate opinion as to the applicability and effect of that clause.

Code of Military Justice. Article 2 (11) of that Code provides, in pertinent part:

"The following persons are subject to this chapter:

.      .      .      .      .

"(11) Subject to any treaty or agreement to which the United States is or may be a party or to any accepted rule of international law, persons serving with, employed by, or accompanying the armed forces outside the United States . . . ."

It is not disputed that existing treaties with each of the foreign sovereignties, within whose territory the alleged offenses occurred, permitted the armed forces of the United States to punish offenses against the laws of the United States committed by persons embraced by Article 2 (11) of the Code. Arguments challenging the reasonableness of Article 2 (11) are presently put aside, for if Clause 14 does not grant to Congress the power to provide for the court-martial trial and punishment of the persons embraced in Article 2 (11) of the Code it may not do so, however reasonable. *Reid* v. *Covert, supra,* 354 U. S., at 74 (concurring opinion).

Did Clause 14 empower Congress to enact Article 2 (11) of the Code? Certain aspects of that broad question have recently been determined in *Reid* v. *Covert, supra,* and, though not a Court opinion, I consider that decision to be binding upon me.[3] In that case four members of the Court held that Article 2 (11) of the Code cannot constitutionally be applied to *civilian dependents* "accompanying" members of the armed forces outside the United States in time of peace, because, in their view, to do so would violate Art. III, § 2, and the Fifth and Sixth

---

[3] Although a member of the Court when the opinions in the *Covert* case were handed down, I was ineligible to and did not participate in the decision of that case because it had been argued, submitted and decided prior to my coming to the Court.

Amendments of the Constitution; and two members of the Court, in separate concurring opinions, agreed with that result, but only with respect to *capital offenses*.

Like my Brother CLARK who writes for the Court today, I am unable to find any basis in the Constitution to support the view that Congress may not constitutionally provide for the court-martial trial and punishment of civilian dependents for capital offenses but may do so for non-capital ones. Certainly there is nothing in Clause 14 that creates any such distinction or limitation. Legalistically and logically, it would seem that the question is one of *status* of the accused person, and that courts-martial either do or do not have jurisdiction and, hence, power to try the accused for all offenses against the military law or for none at all. Sympathetic as one may be to curtailment of the awesome power of courts-martial to impose maximum sentences in capital cases, the question, for me at least, is the perhaps cold but purely legal one of *constitutional power*. There would seem to be no doubt that Congress may constitutionally prescribe gradations of offenses and punishments in military cases. The question is solely whether Clause 14 has granted to Congress any power to provide for the court-martial trial and punishment of civilian dependents "accompanying," and civilians "employed by," the armed forces at military posts in foreign lands in time of peace. If it has, then Congress has acted within its powers in enacting Article 2 (11) of the Code—otherwise not. Inasmuch as six members of the Court have held in *Covert* that Congress may not constitutionally provide for the court-martial trial and punishment of *civilian dependents* "accompanying the armed forces" overseas in peacetime in *capital* cases, and because I can see no constitutional distinction between Congress' power to provide for the court-martial punishment of capital offenses, on the one hand, and non-capital offenses, on the other hand, I conclude that the

holding in *Covert* means that *civilian dependents* accompanying the armed forces in peacetime are not subject to military power, and that it requires affirmance of No. 22, the *Singleton* case.

But each of the three opinions supporting the conclusion reached in *Covert* was at pains to limit the decision to *civilian dependents.* "[T]he wives, children and other dependents of servicemen cannot be placed in that category [of being 'in' the armed services for purposes of Clause 14], even though they may be accompanying a serviceman abroad at Government expense and receiving other benefits from the Government." 354 U. S., at 23. "The mere fact that these women had gone overseas with their husbands should not reduce the protection the Constitution gives them." 354 U. S., at 33. See also 354 U. S., at 45 (concurring opinion of FRANKFURTER, J.), and 354 U. S., at 75–76 (concurring opinion of HARLAN, J.). The main opinion carefully pointed out that "Mrs. Covert and Mrs. Smith . . . had never been *employed by the army,* had never served in the army in any capacity." 354 U. S., at 32. (Emphasis added.)

There is a marked and clear difference between civilian dependents "accompanying the armed forces" and civilian persons "serving with [or] employed by" the armed forces at military posts in foreign lands. The latter, numbering more than 25,000 employed at United States military bases located in 63 countries throughout the world—mainly highly trained specialists and technicians possessing skills not readily available to the armed forces—are engaged in purely military work—as in the case of Guagliardo, employed as an electrical lineman by the Air Force to construct and maintain lines of communication and airfield lighting apparatus and equipment, as also in the case of Wilson, an auditor employed to audit the accounts of the United States Army in Berlin, and as in

'the case of Grisham, employed as a cost accountant by the United States Army Corps of Engineers to assist in setting up a cost accounting system for the building of a line of communications from Pardeau, France, to Kossalater in the American-occupied section of Germany. These civilian employees thus perform essential services for the military and, in doing so, are subject to the orders, direction and control of the same military command as the "members" of those forces; and, not infrequently, members of those forces who are assigned to work with and assist those employees are subject to their direction and control. They have the same contact with, and information concerning, the military operations as members of those forces and present the same security risks and disciplinary problems. They are paid from the same payroll, and have the same commissary, housing, medical, dental, mailing, transportation, banking, tax-exemption, customs, border-crossing and other privileges as members of the armed forces. They are so intertwined with those forces and military communities as to be in every practical sense an integral part of them. On the other hand, civilian dependents "accompanying the armed forces" perform no services for those forces, present dissimilar security and disciplinary problems, have only a few of the military privileges, and generally stand in a very different relationship to those forces than the civilian employees. Nor should there be any confusion about the fact that the materials found in *Covert* to be "too episodic, too meager, to form a solid basis in history, preceding and contemporaneous with the framing of the Constitution, for constitutional adjudication" (354 U. S., at 64, concurring opinion), related, as did the whole case, to "civilian dependents in particular," *ibid.*, not to persons employed at foreign military bases to do essential military work. And I readily agree with the Court today that under the

severability clause in the Code, 70A Stat. 640, ". . . legal effect can be given to each category standing alone." *McElroy* v. *Guagliardo, post,* p. 281.

Determination of the scope of the powers intended by the Framers of the Constitution to be given to Congress by Clause 14 requires an examination into the customs, practices and general political climate known to the Framers and existing at that time. The first Articles of War in this country were those adopted by the Provisional Congress of Massachusetts Bay on April 5, 1775.[4] Those Articles, initially governing the "civilian" army of farmers and tradesmen—the minutemen—who were first involved in the War of the Revolution, were made applicable to "all Officers, Soldiers, and others concerned." Winthrop (Reprint 1920) 947. Article 31 provided:

> "All sellers and retailers to a camp, and all persons whatsoever serving with the Massachusetts Army in the field, though not enlisted Soldiers, are to be subject to the Articles, Rules and Regulations of the Massachusetts Army." *Id.,* at 950.

The American Revolutionary Army initially was governed by "Articles of War" adopted by the Continental Congress on June 30, 1775.[5] Nine of the original 69 Articles provided for the trial by court-martial of persons serving with the army but who were not soldiers. Those Articles were revised by the Continental Congress on September 20, 1776,[6] and, save for minor revisions not here pertinent, governed the Revolutionary Army during the remainder of the war.[7] Thirteen of those Articles

---

[4] Winthrop, Military Law and Precedents (Reprint 1920), 947.

[5] Journals of the Continental Congress, Vol. II, p. 111. Those Articles, with additional Articles enacted November 7, 1775, are reprinted in Winthrop 953 *et seq.*

[6] Those Articles are reprinted in Winthrop 961–971.

[7] The Articles were prepared principally by John Adams. See John Adams, Works, Vol. 3, pp. 83–84; Winthrop 22.

provided for the trial by court-martial of civilians serving with the army, such as "commissaries," [8] "suttlers," [9] "store-keepers," [10] persons "belonging to the forces employed in the service of the United States," [11] and persons "belonging to the forces of the United States, employed in foreign parts." [12] . In 1778, a relevant addition was made. It provided, in pertinent part: "That every person employed either as Commissary, Quarter Master, forage Master, *or in any other Civil Department of the Army* shall be subject to trial by Court Martial for neglect of duty, or other offence committed in the execution of their office . . . ." Journals of the Continental Congress, Vol. X, p. 72. (Emphasis added.) Wagon drivers "receiving pay or hire" in the service of the artillery were made subject to court-martial jurisdiction under the American Articles of 1775 [13] and 1776.[14] Throughout the Revolutionary period, "drivers" and "artillery gunners" were civilian experts. "Horses or oxen, with hired civilian drivers, formed the transport" for the cannon. Manucy, Artillery Through The Ages (G. P. O. 1949), p. 10. Their civilian status in Washington's army is concretely shown by his writings.[15]

---

[8] Articles of War, Sept. 20, 1776, § IV, Art. 6.

[9] *Id.*, § VIII, Art. 1.

[10] *Id.*, § XII, Art. 1.

[11] *Id.*, § XIII, Art. 9.

[12] *Id.*, § XIII, Art. 17.

[13] Articles of War, June 30, 1775, Art. XLVIII; Winthrop 957.

[14] Articles of War, Sept. 20, 1776, § XVI, Art. I; Winthrop 970.

[15] See the report which Washington made to the Committee of Congress With The Army, on January 29, 1778: *"As it does not require military men,* to discharge the duties of Commissaries, Forage Masters and Waggon Masters, who are also looked upon as the money making part of the army, no rank should be allowed to any of them, *nor indeed to any in the departments merely of a civil nature.* Neither is it, in my opinion proper, though it may seem a trivial and incon-

There was a protracted controversy in the Constitutional Convention over whether there should be a standing army or whether the militia of the various States should be the source of military power.[16]   There was, on the one hand, fear that a standing army might be detrimental to liberty; on the other was the necessity of an army for the preservation of peace and defense of the country.[17]   The problem of providing for essential forces and also of assuring enforcement of the unanimous determination to keep them in subjection to the civil power was resolved by inserting the provision that no appropriation for the support of the army could be made for a longer period than two years (Art. I, § 8, cl. 12), and by the continuance of the militia "according to the discipline prescribed by Congress." (Art. I, § 8, cls. 15 and 16, and Amend. II.) [18]

---

sequential circumstance, that they should wear the established uniforms of the army, which ought to be considered as a badge of military distinction." Writings of Washington, Vol. 10, at 379. (Emphasis added.)

Numerous instances of the exercise of military jurisdiction over civilians serving with the army are detailed in Washington's Writings. A "Wagon Master" was so tried and acquitted on January 22, 1778. (Vol. 10, p. 359.) A "waggoner" was so tried and sentenced on May 25, 1778 (Vol. 11, p. 487), and another on September 2, 1780. At the same time, an "express rider" was so tried and convicted. (Vol. 20, pp. 24–25.) On September 21, 1779, a "Commissary of Issues" and a "Commissary of Hides" were tried by court-martial. (Vol. 16, pp. 385–386.) On September 23, 1780, another "waggoner" was so tried and acquitted. (Vol. 20, pp. 96–97.) On December 6 and 16, 1780, another "commissary" and also a "barrack master" were so tried. (Vol. 21, p. 10, and pp. 22–23.) Numerous other court-martial trials of civilians serving with the army are recited in Vol. 10, p. 507; Vol. 12, p. 242; Vol. 13, pp. 54, 314; Vol. 21, p. 190.

[16] Prescott, Drafting the Federal Constitution (1941), pp. 515–525; 5 Elliot's Debates 443–445.

[17] Glenn and Schiller, The Army and the Law, pp. 14, 18–20.

[18] The basis of this conclusion was summarized by James Madison in Beloff, The Federalist, No. XLI, p. 207:

"Next to the effectual establishment of the union, the best possible

It was in the light of this background and upon these considerations that the Framers gave to the representatives of the people—the Congress—the power "To make Rules for the Government and Regulation of the land and naval Forces." Clause 14. That language was taken straight from the Articles of Confederation.[19] In respect thereto, Hamilton said in Beloff, The Federalist, No. XXIII, p. 111:

> "These powers ought to exist without limitation; because it is impossible to foresee or to define the extent and variety of national exigencies, and the correspondent extent and variety of the means which may be necessary to satisfy them. . . ." [20]

Soon after, the formation of the Government under the Constitution, Congress, by the Act of September 29, 1789, c. 25, § 4, 1 Stat. 96, adopted the Articles of War which were essentially the Articles of 1776. By that Act, Congress—it is almost necessary to assume—approved the consistent practice of exercising military jurisdiction over civilians serving with the armed forces, although not actually soldiers. The first complete enactment of the Articles of War subsequent to the adoption of the Constitution was the Act of April 10, 1806. Article 60 of that Act (2 Stat. 366) re-enacted the provisions for jurisdic-

---

precaution against danger from standing armies, is a limitation of the term for which revenue may be appropriated to their support. This precaution the constitution has prudently added. . . ."

[19] Prescott, Drafting the Federal Constitution (1941), p. 526; 5 Elliot's Debates 443.

[20] Hamilton, aide-de-camp to Washington and a distinguished army officer, undoubtedly knew that civilians serving with the army were commonly subjected to court-martial jurisdiction. The same must be presumed to have been known by most, if not all, of the members of the Constitutional Convention, for so many of them had been a part of the Revolutionary Army wherein that practice was commonplace.

tion over sutlers, retainers, and "all persons whomsoever, serving with the armies of the United States in the field, though not enlisted soldiers." Provisions similar to Article 60 have been made in all subsequent re-enactments of the Military Code: In the revision of 1874, Rev. Stat. (2d ed. 1878), p. 236 (Article 63); in 1916, 39 Stat. 651; in 1920, 41 Stat. 787; and in the adoption of the Uniform Code of Military Justice, 64 Stat. 109, codified in 70A Stat. 37, 10 U. S. C. § 802 (11).

In the 1916 general revision of the Articles of War, Congress used language which is substantially equivalent to that of Article 2 (11),[21] and it appears it did not consider that any new concept was being adopted.[22] After full consideration by an eminent committee of experts, Congress, in 1956—recognizing that, although we are not at war, turbulent world conditions require large military commitments throughout the world—re-enacted, in Article 2 (11), the provision that civilians "serving with" the armies of the United States "outside the United

---

[21] Article 2 (d) of the 1916 Articles provided that the following persons should be subject to the Articles of War:

"(d) All retainers to the camp and all persons accompanying or serving with the armies of the United States without the territorial jurisdiction of the United States, and in time of war all such retainers and persons accompanying or serving with the armies of the United States in the field, both within and without the territorial jurisdiction of the United States, though not otherwise subject to these articles." This section was re-enacted in 1920, 41 Stat. 787.

[22] General Enoch H. Crowder, then Judge Advocate General of the Army, stated before the House Committee on Military Affairs: "There is nothing new in the article in subjecting these several classes to the provisions of article 65. It is a jurisdiction which has always been exercised. When any person joins an army in the field and subjects himself by that act to the discipline of the camp he acquires the capacity to imperil the safety of the command to the same degree as a man under the obligation of an enlistment contract or of a commission." Hearings on H. R. 23628, 62d Cong., 2d Sess., p. 61.

States" are subject to military jurisdiction, and it redefined that concept by adding the "employed by" classification.

Clause 14 does not limit Congress to the making of rules for the government and regulation of "members" of the armed forces. Rather, it empowers Congress to make rules for the government and regulation of "the land and naval Forces." The term "land and naval Forces" does not appear to be, nor ever to have been treated as, synonymous with "members" of the armed services.[23]

Viewed in the light of its birth and history, is it not reasonably clear that the grant of Clause 14, to make rules for the government and regulation of the land and naval forces, empowers Congress to govern and regulate all persons so closely related to and intertwined with those forces as to make their government essential to the government of those forces? Do not civilians employed by the armed forces at bases in foreign lands to do essential work for the military establishment, such as was being done by respondent Guagliardo and petitioners Wilson and Grisham, occupy that status and stand in that relationship to the armed forces for which they worked?

This Court has consistently held, in various contexts, that Clause 14 does not limit the power of Congress to the government and regulation of only those persons who are "members" of the armed services. In *Ex parte Milligan*, 4 Wall. 2, 123, it was said, relative to the discipline necessary to the efficient operation of the army and navy, that "Every one connected with these branches of the public service is amenable to the jurisdiction which Congress has created for their government, and, while thus serving, surrenders his right to be tried by the civil courts." In *Duncan v. Kahanamoku*, 327 U. S. 304, 313, this Court recognized the "well-established power of the military to

---

[23] See Cong. Globe, 37th Cong., 3d Sess., 995 *et seq.*

exercise jurisdiction over members of the armed forces [and] *those directly connected with such forces . . . ."* (Emphasis added.) In *Toth* v. *Quarles,* 350 U. S. 11, 15, this Court said that Clause 14 "would seem to restrict court-martial jurisdiction to persons who are actually members *or part of* the armed forces." (Emphasis added.) Of even greater relevance, the main opinion in *Covert,* although expressing the view that Clause 14 authorized military trials only of persons "in" the armed forces, recognized "that there might be circumstances where a person could be 'in' the armed services for purposes of Clause 14 even though he had not formally been inducted into the military or did not wear a uniform." 354 U. S., at 23. To repeat the query of this Court, made under very similar circumstances, in *Ex parte Reed,* 100 U. S. 13, 22, "If these [civilian employees] are not *in* the [armed] service, it may well be asked who are." (Emphasis added.) That case held that a civilian, employed to serve aboard ship as the clerk of a paymaster of the United States Navy and who was dismissable at the will of the commander of the ship, occupied such "an important [place] in the machinery of the navy . . . [that] [t]he good order and efficiency of the service depend[ed] largely upon the faithful performance of [his] duties" and brought him "in the naval service," so that he was subject to trial and punishment by court-martial for an offense committed in a Brazilian port. 100 U. S., at 21–22. *Johnson* v. *Sayre,* 158 U. S. 109, reaffirmed the principle on practically identical facts.

The provisions of Art. III, § 2, and the Fifth and Sixth Amendments of the Constitution requiring the trial of capital or otherwise infamous crimes in an Article III court, upon an indictment of a grand jury, by an impartial petit jury, are not applicable to "cases arising in the land or naval forces." The Fifth Amendment expressly excepts those cases. It cannot be said that the "words,

in the Fifth Amendment, relating to the mode of accusation, restrict the jurisdiction of courts martial in the regular land and naval forces." *Johnson* v. *Sayre, supra,* 158 U. S., at 115. The exception in the Fifth Amendment "was undoubtedly designed to correlate with the power granted Congress to provide for the 'Government and Regulation' of the armed services . . . ." (*Reid* v. *Covert, supra,* at 22), and so was the jury-trial provision of the Sixth Amendment, for "the framers of the Constitution, doubtless, meant to limit the right of trial by jury, in the sixth amendment, to those persons who were subject to indictment or presentment in the fifth." *Ex parte Milligan, supra,* 4 Wall., at 123. See also *Ex parte Quirin,* 317 U. S. 1, 40. The power conferred upon Congress by Clause 14 to provide for court-martial trials of offenses arising in the land and naval forces is independent of and not restricted by Article III. or the Fifth and Sixth Amendments to the Constitution.

Counsel for the convicted employees argue, with the citation and force of much history, that even if civilians "serving with [or] employed by" the armed forces are subject to the military power of courts-martial, such could be so only in respect of offenses committed while those forces are "in the field." Some of the early Articles of War limited military jurisdiction over certain civilian employees to the period when the army was "in the field." [24] What is really meant by the term "in the

---

[24] Article XXXII of American Articles of War of 1775, 2 J. Cont. Cong. 111, provided that "All suttlers and retailers to a camp, and all persons whatsoever, serving with the continental army in the field . . ." were subject to court-martial jurisdiction.

Article 60 of the American Articles of War of 1806, 2 Stat. 359, 366, provided that "All suttlers and retainers to the camp, and all persons whatsoever, serving with the armies of the United States in the field . . ." were subject to court-martial jurisdiction.

Article 63 of American Articles of War of 1874, R. S. § 1342,

field"? Seemingly, it does not mean "in actual war" or even "in time of war." "The essential element was thought to be, not so much that there be war, in the technical sense, but rather that the forces and their retainers be 'in the field.' " *Reid* v. *Covert, supra,* 354 U. S., at 71, n. 8 (concurring opinion). Historically, the term has been thought to include armed forces located at points where the civil power of the Government did not extend or where its civil courts did not exist. Prior to the Civil War, a number of civilians employed by the armed forces were tried and punished by courts-martial in time of peace.[25] In 1814, the Attorney General expressed the opinion that civilian employees of the navy were subject to punishment by court-martial for offenses committed on board vessels beyond the territorial jurisdiction of our civil courts. 1 Op. Atty. Gen. 177. The term "in the field" was thought to apply to organized camps stationed in remote places where civil courts did not exist or were not functioning. In 1866, the Judge Advocate General of the Army so declared.[26] But thereafter, Winthrop ex-

---

provided that "All retainers to the camp, and all persons serving with the armies of the United States in the field . . ." were within the jurisdiction of courts-martial.

[25] At Ft. Monroe, Va., in 1825; Ft. Washington, Md., in 1825; Ft. Gibson, in what is now Oklahoma, in 1833; Ft. Brooke, Fla., in 1838; Camp Scott, Utah Territory, in 1858; Ft. Bridger, Utah Territory, in 1858.

[26] On November 15, 1866, the Judge Advocate General of the Army formulated the following opinion and direction:

"It is held by this Bureau and has been the general usage of the service in times of peace, that a detachment of troops is an army 'in the field' when on the march, or at a post remote from civil jurisdiction.

"It has been the custom and is held to be advisable, that civil employees, sutlers and camp followers when guilty of crimes known to the civil law, to turn the parties over to the courts of the vicinity in which the crimes were committed. For minor offences against good orders and discipline, it has been customary to expel the parties from

pressed the view that the term "in the field" is to be "confined both to the period and pendency of war and to acts committed on the theatre of the war." [27] This would seem to ignore the fact that the constitutional authority involved is Clause 14, not the war power, and that the Clause 14 powers apply to times of both peace and war. Moreover, even at the time when Winthrop wrote, there was no consensus of interpretation supporting his view. In 1872, the Attorney General issued an opinion which concluded that civilians serving with troops in Kansas, Colorado, New Mexico, and the Indian Territory (where civil courts did not exist or were not functioning) in the building of defensive earthworks to protect against threatening Indians were "in the field." 14 Op. Atty. Gen. 22.[28] As earlier observed, this Court held, in 1879, in *Ex parte Reed, supra,* and again in 1895, in *Johnson* v. *Sayre, supra,* that the civilian clerk of a paymaster of the navy might be tried and punished by a court-martial for a military offense committed in peacetime aboardship in a foreign port.

Doubtless, with the passing of the frontier and the extension of civil courts throughout the territorial bound-

the Army: If, however, it is sought to punish civil employees in New Mexico, for crimes committed at a post where there are no civil courts before which they can be tried, it is held that they can be brought to trial before a General Court Martial, as they must be considered as serving with 'an army in the field' and, therefore, within the provision of the 60th Article of War." Op. J. A. G. of the Army, Nov. 15, 1866, 23 Letters sent, 331 (National Archives).

[27] Winthrop, Military Law and Precedents, 101.

[28] The opinion rested primarily on the ground that the term "in the field" implies military operations with a view to an enemy, and that an army was "in the field" when "engaged in offensive or defensive operations." It also noted, p. 24, that:

"Possibly the fact that troops are found in a region of country chiefly inhabited by Indians, and remote from the exercise of civil authority, may enter into the description of 'an army in the field.'"

aries of the United States, detachments of troops stationed within our borders may not in time of peace be regarded as "in the field." But, it seems to me that armed forces of the United States stationed at bases in foreign lands—where jurisdiction of our civil courts does not extend—must, under turbulent world conditions, be otherwise regarded. Because of long-existing world tensions and with the fervent hope of preventing worse, the United States Government has stationed armed forces at military bases in 63 foreign lands throughout the world. We are told that they must be kept constantly alert and ready to prevent or, if and when they arise, to put down "brush fires," which if allowed to spread might ignite a world-wide holocaust of atomic war. Because of physical necessities, such a war, like the frequently recurring "brush fires," could be suppressed, if at all, mainly from those bases. The forces at those bases are as much "in the field" in the one case as in the other. Though there be no war in the technical sense, those forces while so engaged in foreign lands—where our civil courts do not exist—are in every practical sense "in the field." They are as clearly "in the field" as were American soldiers while building fortifications to protect against threatening Indians in New Mexico and the Indian Territory, where our civil courts did not exist, in the days of the frontier. Op. J. A. G. of the Army, Nov. 15, 1866, 23 Letters sent, 331 (National Archives) and see note 26; 14 Op. Atty. Gen. 22, and see note 28.

Clause 14 empowers Congress to "make Rules"—all necessary and proper rules—"for the Government and Regulation of the land and naval Forces"—not just for "members" of those forces, but the "Forces," and not only in time of war but in times of both peace and war. In the exercise of that granted power, Congress has promulgated rules, the Uniform Code of Military Justice, for the government of the "armed forces" and, to that end, has

deemed it necessary, as witness Article 2 (11), to include persons "employed by" those forces when "outside the United States"—where our civil courts have no jurisdiction and do not exist—in times of both peace and war. In the light of all the facts, it would seem clear enough that Congress could rationally find that those persons are "in" those forces and, though there be no shooting war, that those forces, in turn, are "in the field"; and hence Congress could and did constitutionally make those employees subject to the military power. Both the practical necessities and the lack of alternatives, so clearly demonstrated by MR. JUSTICE CLARK in the *Covert* case, 354 U. S., at 78 (dissenting opinion), strongly buttress this conclusion, if, indeed, it could otherwise be doubted.

For these reasons, I would affirm No. 22, the *Singleton* case; reverse No. 21, the *Guagliardo* case; and affirm Nos. 37 and 58, the *Wilson* and *Grisham* cases.