**In re Ulysses RIVERS, Jr., Debtor.**

**Bankruptcy No. 1–81–00682.**

United States Bankruptcy Court, E. D. Tennessee.

April 14, 1982.

---

Fred T. Hanzelik, Lee & Hanzelik, Chattanooga, Tenn., Henry F. Field and Peter Y. Connor, Friedman & Koven, Chicago, Ill., for Alabama Furniture Co.; Abe Fortas, Fortas & Koven, Washington, D. C., of counsel.

Kyle R. Weems and Richard T. Klingler, Weill, Ellis, Weems & Copeland, Chattanooga, Tenn., for C. Kenneth Still, Trustee.

Jeffrey Lee Hoffman for Southeast Tennessee Legal Services, Chattanooga, Tenn., amicus curiae.

## MEMORANDUM

RALPH H. KELLEY, Bankruptcy Judge.

The debtor, Ulysses Rivers, Jr., filed a petition and plan under chapter 13 of the Bankruptcy Code. A creditor, Alabama Furniture Company, filed a motion to dismiss the case.

The motion avers that the court cannot constitutionally exercise jurisdiction in a bankruptcy case ‘because the bankruptcy judge does not have the tenure and salary protections afforded to federal judges by Article III, § 1 of the United States Constitution.

The creditor filed a proof of claim for $782.23. The claim was secured by a perfected, unavoidable, purchase money security interest in household goods. In his chapter 13 plan, the debtor proposed to treat $350.00 of the claim as secured and pay that part in full, but over a longer period of time than allowed by the contract with the creditor. See 11 U.S.C. §§ 506 & 1325(a)(5). The plan proposed to pay 50% on the re-

mainder, $432.23, as a general unsecured claim. See 11 U.S.C. § 1325(a)(5). The court confirmed the plan specifically without prejudice to creditor's motion to dismiss.

Article III, § 1 of the United States Constitution provides:

> The judicial power of the United States shall be vested in one Supreme Court, and in such inferior courts as the congress may from time to time ordain and establish. The judges, both of the Supreme Court and the inferior courts, shall hold their offices during good behavior, and shall, at stated times receive for their services, a compensation, which shall not be diminished during their continuance in office.

Tenure during good behavior and a protected salary will hereafter be referred to as "constitutional tenure".

Bankruptcy judges serve for a term of years, rather than during good behavior. Presently, the term is until 1984. Bankruptcy Reform Act § 404(b) & (d).[1] In 1984, the term will be increased to fourteen years. Bankruptcy Reform Act § 201 (28 U.S.C. § 152) & § 402(b), (c), & (d). A bankruptcy judge may be removed from office for reasons other than breach of the constitutional standard of good behavior. Bankruptcy Reform Act § 404(d); Bankruptcy Act § 34, 11 U.S.C. § 62 (1976). By statute a bankruptcy judge's salary can be reduced during his term but not below what it was at the beginning. Bankruptcy Reform Act § 404(d); Bankruptcy Act § 40(a) & (b), 11 U.S.C. § 68 (1976). Without the constitutional protection, a change in the statutes can reduce the slight protection they give.

The legislative history of the Bankruptcy Reform Act shows that the major compromise between the Senate and the House of Representatives was deletion from the final bill of any provisions that would make the bankruptcy courts Article III courts or give the bankruptcy judges constitutional ten-

ure. See the following articles in the 1979 Annual Survey of Bankruptcy Law: Klee, Legislative History of the Bankruptcy Reform Act of 1978, reprinted from 28 DePaul L. Rev.—(1979); Feidler & Dixon, Reflections on the Legislative History of the Bankruptcy Reform Act of 1978; Wallop, Footnotes to the Bankruptcy Reform Act of 1978; Clarkson, A Brief Overview of the Congressional Debate on the Bankruptcy Court System. See also 1 Collier on Bankruptcy ¶ 2.01[c] (15th ed. 1981).

It is clear that bankruptcy judges do not have constitutional tenure. The question is whether the Constitution requires that they have it. Before considering the arguments in detail, the court must answer a preliminary question.

(1)

■ The creditor has standing to raise the constitutional issue. The provisions of Article III, § 1 were meant to preserve the independence of federal judges not for their own benefit but for the benefit of litigants in the federal courts. In *Glidden v. Zdanok* the petitioners contended that they were denied the right to independent judges because judges of the Court of Claims and the Court of Customs and Patent Appeals, sitting by designation, participated in their cases in the federal district court and the circuit court of appeals. 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962). In an opinion joined in by three justices, the court held that the petitioners could raise the issue.

> No contention is made that either [judge] displayed a lack of appropriate judicial independence, or that either sought by his rulings to curry favor with Congress or the Executive. Both indeed enjoy statutory assurance of tenure and compensation, and were it not for the explicit provisions of Article III we should be quite unable to say that either judge's participation even colorably denied the petitioners independent judicial hearings.

---

1. Bankruptcy Reform Act of 1978, Pub.L.No. 95 598, 92 Stat. 2549 (1978). The cited provisions leave it unclear whether a judge first

appointed during the transition is appointed for six years or until the end of the transition period on March 31, 1984.

Article III, § 1, however, is explicit and gives petitioners a basis for complaint without requiring them to point to particular instances of mistreatment in the record. . . .

82 S.Ct. at 1464. Cf. *Palmore v. United States*, 411 U.S. 389, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973); *Crowell v. Benson*, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1931).

It cannot rightfully be said that the creditor was not a litigant. Its contract rights were affected by the chapter 13 case at least as much as they could have been affected in a suit involving the creditor and the debtor as plaintiff and defendant. Furthermore, the question was not lost as a result of confirmation of the chapter 13 plan. Confirmation did not require and was not obtained by creditor's consent. The creditor may argue after confirmation that it was denied the constitutional protection of an independent judge.

The importance of the independent judiciary requirement supported the Supreme Court's invocation of the Rule of Necessity in *United States v. Will.* 449 U.S. 200, 101 S.Ct. 471, 66 L.Ed.2d 393 (1980). In that case, federal district judges challenged the application to them of a statute that would deny compensation to which they arguably had become entitled. The statute also applied to the justices of the Supreme Court. The Supreme Court held that the Rule of Necessity required them to decide even though another statute would disqualify them because of their personal interest in the outcome. Writing for himself and the seven other justices who took part, Chief Justice Burger said:

As this court has observed elsewhere, the Compensation Clause is designed to benefit, not the judges as individuals, but the public interest in a competent and independent judiciary. *Evans v. Gore*, 253

U.S. 245, 253, 40 S.Ct. 550, 553, 64 L.Ed. 887 (1920). The public might be denied resolution of this crucial matter if first the District Judge, and now all the Justices of this Court, were to ignore the mandate of the Rule of Necessity and decline to answer the question presented.

101 S.Ct. at 481–482.

It must be said that the independent judiciary provisions are more than a due process protection of the rights of litigants. As the court will explain later, an independent judiciary is a crucial element in the constitutional structure of the federal government. The structure of the federal government as required by specific constitutional provisions implementing "separation of powers" is the first line of defense of rights secured by the Constitution. This is essentially the point made in *Glidden v. Zdanok*, quoted above.

The writings of the philosopher Montesquieu were familiar to some of the drafters of the Constitution. Montesquieu conceded that "constitutional liberty", by which he meant a government structured to secure individual liberty, would not necessarily secure it.[2] Nevertheless, the drafters of the Constitution intended to create a federal government whose structure would be effective toward securing the political rights of the people.[3] To that end, federal courts are bound by self-interest to decide cases in which the question is whether a tribunal created by Congress is established contrary to particular constitutional limits respecting the structure of the federal government; at least, the courts are bound to decide in cases where there are satisfactory criteria for judicial application of the constitutional limits.[4] As will be evident, there are satisfactory criteria for decision in this case.

The creditor should not be denied the right to raise this important issue because it

---

**2.** C. Montesquieu, The Spirit of Laws, Book XI & Book XII, Part 1, reprinted in vol. 38, Great Books of the Western World (1952).

**3.** The drafters' method is revealed in the final paragraph of the quotation from The Federalist No. 51, below at p. 12. Montesquieu made essentially the same point in Part 4 of Book XI

of The Spirit of Laws: "To prevent this abuse [of power], it is necessary . . . that power should be a check to power."

**4.** See Wright, Law of Federal Courts § 14 (3d ed. 1976) (discussion of the "political question" limit on justiciability).

has shown no particular harm resulting to it from the fact that the judge who decided the issues lacked constitutional tenure. Such a requirement of proof would write the tenure provisions out of the Constitution as a protection of the rights of litigants. It is important to all citizens that the federal government be structured as required by the Constitution, but it is particularly important to persons compelled to participate in federal court proceedings that the court be established in accordance with specific constitutional provisions intended to secure protection of their rights.

(2)

The creditor's motion was opposed by C. Kenneth Still, the chapter 13 trustee, and by Southeast Tennessee Legal Services, which was allowed to participate as amicus curiae. The Attorney General of the United States declined to intervene.

There are basically two arguments made in opposition to creditor's motion. The first argument is that bankruptcy cases need not be heard by an Article III court. The trustee's argument on this point is divided generally according to the several points it includes but often in the confusing terms of "the judicial power". Amicus took a different approach. Amicus argued that Congress has the power to commit bankruptcy matters to a non-Article III court.

The trustee made another argument—that the bankruptcy court is not independent of the Article III judicial system. The thrust of this argument is that even if a judge with constitutional tenure is required, the requirement is met by the right to appeal to an Article III court or by the federal district court's control of bankruptcy cases. This argument is not relevant unless it is decided that constitutional tenure is required. The court will therefore consider the main question first. Does the constitution require that the bankruptcy judges have constitutional tenure?

(3)

■ Despite Article III, § 1, Congress can establish courts whose judges do not have constitutional tenure. The tenure provisions of Article III, § 1 are not an invariable mandate to Congress, but must be a limit on its power to create courts. Otherwise, they are meaningless. When is Congress constitutionally justified in disregarding the constraints of Article III?

In searching for a rationale, the court must follow fundamental ideas of constitutional interpretation. The Constitution establishes only a basic framework for the operation of the federal government. This makes every provision important but calls for restraint in interpretation. It must be remembered that the Constitution was meant to establish a workable system of government. Its provisions must be read in light of the purposes they were meant to serve in the overall constitutional plan of government.

The constitutional tenure provisions can be understood only in light of the Constitution's implementation of "separation of powers". With regard to constitutional separation of powers, two points are important.

The Constitution does not specifically provide for separation of powers. It creates a federal government composed of three branches—legislative, executive, and judicial—and gives each powers to perform its functions. The Constitution also contains specific provisions meant to give each branch the independence and ability to restrain the others to their proper functions. Thus, constitutional separation of powers can be given effect only by interpretation of the specific provisions meant to implement separation of powers.

The second point is related. Compulsion of the people or the states is the ultimate object of federal power. In this sense, the federal power is indivisible. Separation of powers controls the complete exercise of federal power by requiring the cooperation of more than one of the three not always cooperative groups of people who form the three branches. In other words, separation of powers is concerned primarily with *who* performs what function.

In Number 47 of *The Federalist*, James Madison reviewed Montesquieu's reasons for separation of powers:

"When the legislative and executive powers are united in the same person or body," says he, "there can be no liberty because apprehensions may arise lest *the same* monarch or senate should *enact* tyrannical laws to *execute* them in a tyrannical manner." Again: "Were the power of judging joined to the legislative, the life and liberty of the subject would be exposed to arbitrary control, for the *judge* would then be the *legislator.* Were it joined to the executive power, *the judge* might behave with all the violence of *an oppressor.*" ...

In Number 48, Madison explained that separation of powers did not mean complete separation of powers.

I shall undertake, in the next place, to show that unless these departments be so far connected and blended as to give each a constitutional control over the others, the degree of separation which the maxim requires, as essential to a free government, can never in practice be duly maintained.

This is consistent with the common understanding that the Constitution was intended to give each branch power to check the other branches' exercise of power. The tenure provisions can be understood in this light as an element of separation of powers.

Madison's comments in Number 51 of *The Federalist* show that the tenure provisions of Article III are an element of separation of powers.

In order to lay a due foundation for that separate and distinct exercise of the different powers of government ... it is evident that each department should have a will of its own; and consequently should be so constituted that the members of each should have as little agency as possible in the appointment of the members of the others. ...

It is equally evident that the members of each department should be as little dependent as possible on those of the others for the emoluments annexed to their offices. Were the executive magistrate, or the judges, not independent of the legislature in this particular, their

independence in every other would be merely nominal.

But the great security against a gradual concentration of the several powers in the same department consists in giving to those who administer each department the necessary constitutional means and personal motives to resist encroachments of the others. ... Ambition must be made to counteract ambition. The interest of the man must be connected with the constitutional rights of the place.

More specific reasons for the tenure provisions were given by Alexander Hamilton in *The Federalist* Number 78. He considered tenure during good behavior necessary to give the judiciary the independence needed—

(1) to declare unconstitutional and unenforceable laws passed by Congress but contrary to specific constitutional limits on Congress's lawmaking authority;

(2) to protect individuals from unconstitutional deprivations of their rights and dangerous, unconstitutional innovations in government, even though brought about by or reflecting the will of the majority of citizens;

(3) to restrict the application of and thereby discourage passage of laws that are unjust to particular classes of citizens;

(4) to attract competent people to the federal bench.

Of these concerns, all but the fourth are relevant to the question at hand. It is wholly a legislative consideration.

Hamilton justified the absence of a provision on removal of judges for inability because it would be too difficult to apply and so vague it "would much oftener give scope to personal and party attachments and enmities than advance the interests of justice and the public good." *The Federalist* No. 79.

In Number 79, Hamilton did not add any other reasons for judicial independence but did reiterate the point that the judges' salaries should be protected because "[i]n the

general course of human nature, *a power over a man's subsistence amounts to a power over his will.*"

The decisions of the Supreme Court follow an understandable pattern with regard to the purpose of the tenure provisions in preserving separation of powers. But the decisions can be understood only in light of the related concept of "federalism". It concerns the relationship between the federal government and the states.

The Constitution does more than divide the power of the union among the three branches of the federal government. It first divides general sovereign power over the people between the states and the federal government. The Constitution was meant to limit the federal government's sovereign power to that necessary for national functions. General, indefinite sovereign power was reserved to the states or the people.

In Number 39 of *The Federalist*, James Madison explained:

The difference between a federal and national government, as it relates to the *operation of the government*, is by the adversaries of the plan of the convention supposed to consist in this, that in the former the powers operate on the political bodies composing the Confederacy in their political capacities; in the latter, on the individual citizens composing the nation in their individual capacities. On trying the Constitution by this criterion, it falls under the *national* not the *federal* character; though perhaps not so completely as has been understood....

But if the government be national with regard to the *operation* of its powers, it changes again when we contemplate it in relation to the extent of its powers. The idea of a national government involves in it not only an authority over the individual citizens, but an indefinite supremacy over all persons and things, so far as they are objects of lawful government.... In this relation, then, the proposed government cannot be deemed a *national* one; since its jurisdiction extends to certain enumerated objects only, and leaves to the several States a residuary and inviolable sovereignty over all other objects....

In Number 9, Alexander Hamilton remarked that the constitutional scheme of distribution of powers between the states and the United States government comports with the idea of federal government.

The proposed Constitution, so far from implying an abolition of the State governments, makes them constituent parts of the national sovereignty, by allowing them a direct representation in the Senate, and leaves in their possession certain exclusive and very important portions of sovereign power. This fully corresponds, in every rational import of the terms, with the idea of a federal government.

The tenth amendment, adopted soon after the Constitution, also reflects the idea of federalism.

The powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people.

In Article III, federalism is reflected primarily in § 2, cl. 1, the "judicial power" clause.

The judicial power shall extend to all cases, in law and equity, arising under this constitution, the laws of the United States, and treaties made, or which shall be made, under their authority;—to all cases affecting ambassadors, other public ministers and consuls;—to all cases of admiralty and maritime jurisdiction;—to controversies to which the United States shall be a party;—to controversies between two or more states;—between a state and citizens of the same state claiming lands under grants of different states, and between a state or citizens thereof, and foreign states, citizens or subjects.

This provision limits application of the judicial power by describing the kinds of cases or controversies to which it applies. Cases or controversies omitted from the description are not subject to the judicial pow-

er. The most notable omission clearly reveals the federalism basis of the description: cases between citizens of the same state and not involving the Constitution or any federal law or treaty are not subject to the judicial power.

On the other hand, the terms "case" or "controversy" have been interpreted as a separation of powers limitation. The Article III courts perform only the traditional functions of courts, primarily deciding cases or controversies. Congress cannot impose other duties on the Article III courts.

Generally, the federalism concerns behind constitutional tenure are also reflected in *The Federalist* No. 78. The Article III courts have a political place in our system of government. With respect to specific constitutional limitations on state and federal power, the Article III courts mediate between the other branches of the federal government and the people, between the federal government and the states, and between the states and the people. That this function is performed by deciding specific cases and controversies does not mean it is not a "political" function in the general sense. For our purposes, the important point is that when a court is in the position to decide such questions, the federalism policies behind constitutional tenure apply.

As to the specific federalism limits on the judicial power, this is a situation where the Constitution connects "[t]he interests of the man . . . with the constitutional rights of the place." *The Federalist* No. 51 (Madison.) The independence of Article III judges is meant to be felt by them as a personal virtue that is threatened by Congressional attempts to require them to perform duties not traditionally performed by courts or to decide cases not described in Article III, even though the reach of their individual power would be increased.

(4)

Before considering the bankruptcy courts in light of the policies behind constitutional tenure, the court must clarify the issue.

It is established that most of the jurisdiction exercised by the bankruptcy courts is jurisdiction that could be exercised by Article III courts. There is some question as to whether it includes cases or controversies not of a kind described in Article III, § 2, cl. 1. See generally, Note: Bankruptcy and the Limits of Federal Jurisdiction, 95 Harv. L.Rev. 703 (1982). That is not a problem in this case. In this case, the question is whether the bankruptcy jurisdiction that can be exercised by Article III courts can also be exercised by non-Article III courts. The court is concerned with constitutional justifications for giving non-Article III courts or other tribunals, including administrative agencies, the power to decide disputes that definitely are cases or controversies justiciable in Article III courts.

Congress is not required to create "inferior federal courts" as contemplated in Article III, § 1. Congress can and often has let the state courts decide cases and controversies of the kinds described in Article III. It has been argued that such cases can therefore be decided by non-Article III federal courts.

The argument overlooks the point that the standards of Article III are basic elements in the structure of the federal government. They constrain the methods by which the federal government can exercise "the judicial power". Whenever Congress creates a federal tribunal, the question necessarily arises whether it must meet the standards of Article III. They are a limit on Congress's power to create *federal* courts.

The separation of powers and federalism concerns behind Article III are not a problem with allowing state courts to decide cases that could be decided in Article III courts. As to separation of powers, the tenure and salary of state judges are free of direct control by Congress or the President. As to federalism concerns, they apply when Congress creates a federal tribunal as a mediator of federal and state power. Though federalism concerns may lead Congress to create lower Article III courts, the Constitution does not demand it.

The argument based on the use of the state courts is essentially a part of the

argument that constitutional tenure is a due process right and is therefore required only when necessary for a fair trial. *Cf. Crowell v. Benson*, 285 U.S. 22, 86–87, 52 S.Ct. 285, 306–307, 76 L.Ed. 598 (1931) (J. Brandeis dissenting); *Den (Murray's Lessee) v. Hoboken Land & Improvement Company*, 59 U.S. (18 How.) 272, 15 L.Ed. 372 (1856). That a case can be left for decision before a state court judge who lacks constitutional tenure suggests that due process does not require constitutional tenure for a fair trial. That may be true, but it overlooks the fact that Article III tenure is an element in the constitutional structure of the federal government. In that sense, it may be a right of litigants in a federal forum even if it is not necessary for a fair trial.

The court comes now to consideration of the bankruptcy courts in light of the separation of powers and federalism concerns behind constitutional tenure.

### (5a)

Whether these concerns indicate that the judges of a particular tribunal should have constitutional tenure depends on the kind of cases they decide or preside over. It is less evident, but the extent of the tribunal's power is also relevant.

The point that is easiest to overlook is the beginning point. With regard to the subject at hand, exactly how does the Constitution distribute sovereign power between the states and the federal government and federal power among the branches of the federal government?

To a great extent, the decisions of the Supreme Court can be explained on the ground that an Article III court with limited jurisdiction and constitutionally independent judges was not required under the Constitution's specific distribution of powers.

The first examples are courts in the territories and the District of Columbia. In the territories and the District of Columbia, there are no sovereign state governments between the people and the federal government. The concerns of federalism do not demand that the territorial courts or the local courts of the District meet the standards of Article III. Furthermore, the Constitution says that Congress shall provide for the government of the territories and govern the District of Columbia. Art. IV, § 3, cl. 2;[5] Art. I, § 8, cl. 17.[6] These provisions recognize the necessity of differences in the form of the federal government in the territories and the District of Columbia. They are the basis for saying that the local courts of each need not be subject to the separation of powers requirements of Article III, particularly the case or controversy limitation and the constitutional tenure provisions. See *Palmore v. United States*, 411 U.S. 389, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973); *O'Donoghue v. United States*, 289 U.S. 516, 53 S.Ct. 740, 77 L.Ed. 1356 (1932); *American Insurance Co. v. Canter*, 26 U.S. 511, 518, 7 L.Ed. 242, 248 (1828).

The non-Article III military courts provide another example, though for a particular subject matter rather than geographic areas. The Constitution gives Congress the power to provide for the government of the military forces. Art. I, § 8, cl. 14;[7] see also Art. I, § 8, cl. 15.[8]

This has been interpreted to mean that Congress can create non-Article III military courts but with limited jurisdiction. Generally, their jurisdiction is limited to members of the military and to offenses that interfere with the internal discipline necessary

---

**5.** "The congress shall have the power to dispose of and make all needful rules and regulations respecting the territories or other property belonging to the United States . . . ."

**6.** "The congress shall have the power . . . [t]o exercise exclusive legislation in all cases whatsoever, over such district . . . as may . . . become the seat of government of the United States . . . ."

**7.** "The congress shall have the power . . . [t]o make rules for the government and regulation of the land and naval forces."

**8.** Subject to some limitations, this clause gives Congress the power to provide for governing such part of the state militia as may be employed in the service of the United States.

to maintain the military as an effective fighting force. *O'Callahan v. Parker*, 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969); *Kinsella v. United States*, 361 U.S. 234, 80 S.Ct. 297, 4 L.Ed.2d 268 (1960); *McElroy v. United States*, 361 U.S. 281, 80 S.Ct. 305, 4 L.Ed.2d 282 (1960); *Grisham v. Hagan*, 361 U.S. 278, 80 S.Ct. 310, 4 L.Ed.2d 279 (1960); *Reid v. Covert*, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957); *United States ex rel. Toth v. Quarles*, 350 U.S. 11, 76 S.Ct. 1, 100 L.Ed. 8 (1955).

These limitations were imposed in cases involving criminal offenses on the ground that defendants generally should be entitled to all the protections of the Bill of Rights and Article III, some of which are not afforded the defendants in the military courts.

The first question is whether there is any similar provision in the Constitution with the respect to bankruptcies.

The court begins with the premise that if a federal court is to be created to decide cases or controversies subject to the judicial power, Article III is the constitutional norm.[9] Congress's Article I power to pass a statute is the commonest source of federal power over a particular subject matter, but the constitutional structure of the federal government is the constrictive channel through which that power usually must flow.

Congress's legislative powers with regard to the territories, the District of Columbia, and the military, are powers to provide for their government. The constitutional provisions recognize obvious and necessary variations in the structure of the federal government with respect to how federal power can be exercised in the territories, the District of Columbia, and the military.

The Constitution gives Congress the power "[t]o establish ... uniform laws on the subject of bankruptcies throughout the United States." Art. I, § 8, cl. 4. This does not recognize any exception to the normal structure of the federal government.

The clause does limit the power of the states to legislate on the subject of bankruptcies. All this means is that with respect to the enactment of statutes on the subject, Congress governs the nation. It does not mean that Congress is the whole of the federal government or can ignore its normal form in selecting the agencies to carry out bankruptcy statutes.

Generally, the power of Congress to pass a statute on a particular subject does not mean it is constitutional for Congress to create non-Article III courts to decide cases arising under the statute. Such a rule would make the constraints of Article III meaningless. That the Constitution gives Congress exclusive power to enact bankruptcy statutes only settles the question of where the concerns of federalism directed the legislative power. As to how that power can be put into effect, the normal considerations of federalism and separation of powers determine whether a tribunal with bankruptcy jurisdiction must meet the Article III standards.

(5b)

The decisions of the Supreme Court reveal that there are disputes that can be decided by the Article III courts but may be decided by non-Article III courts. The next question is whether bankruptcy cases are in that category.

■ The Court of Claims cases reveal that money claims against the United States can be tried in non-Article III courts. This result is constitutionally justifiable on the ground that it presents no separation of powers problem. Because of sovereign immunity and the necessity of Congressional appropriations for the payment of debts of the United States, Congress and the President, as a matter of basic constitutional law, have complete control of the payment of money claims against the United

---

**9.** See L. Finley, Article III Limits on Article I Courts: The Constitutionality of the Bankruptcy Court and the 1979 Magistrate Act, 80 Colum.L.Rev. 561, 581-82 (1980); T. Krattenmaker, Article III and Judicial Independence: Why the New Bankruptcy Courts are Unconstitutional, 70 Geo.L.J. 297, 301 303 (1982).

States.[10] The Constitution does not require judges constitutionally independent of Congress to decide cases that Congress could completely decide. *Williams v. United States*, 289 U.S. 553, 53 S.Ct. 751, 77 L.Ed. 1372 (1933), overruled on other grounds, *Glidden v. Zdanok*, 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1971).[11]

In *Ex Parte Bakelite Corporation*, the Supreme Court avoided specific case or controversy problems by holding that the Court of Customs Appeals was not an Article III court. 279 U.S. 438, 49 S.Ct. 411, 73 L.Ed. 789 (1929), overruled on other grounds *Glidden v. Zdanok*, cited above.[12] It is not at all clear why the Supreme Court thought enforcement of the customs laws generally could be left to executive officers. Perhaps it was a tradition, already existing when the Constitution was adopted, that revenue statutes are enforced in all respects by executive officers. In any event, the case is of little import to the question at hand, since bankruptcy statutes certainly are not revenue laws. The more general rationale suggested in the Court of Claims cases and others is the important one.

It is necessary to understand the public rights rationale suggested in *Den (Murray's Lessee) v. Hoboken Land & Improvement Company*, cited above. The suggested rationale actually says only what the court has already explained. Some disputes between the government and individuals can be finally resolved by Congress and the President because the Constitution allows it. For such disputes, executive officers can be given the power to make decisions that bind the Article III courts as to the facts or both the facts and the law, even though Congress might have brought the controversy within the cognizance of the Article III courts in the first instance. 59 U.S. (18 How.) 284–285, 15 L.Ed. 377–378. Obviously, bankruptcy cases are not primarily disputes between the government and individuals that the Constitution allows to be finally resolved by Congress or the President.

The *Den* opinion also states that the Constitution may allow Congress or the President to decide some disputes between individuals. In such cases, the actions of executive officers can be conclusive. 59 U.S. (18 How.) 284–285, 15 L.Ed. 378. Nothing in the Constitution suggests that bankruptcy cases are in that category.

Finally, the court must distinguish the administrative agency rationale. It allows executive officers to decide in the first instance many cases that do not come under the public rights rationale and are not disputes between private parties that can be decided by Congress or the President. The administrative agency rationale will be discussed more fully later. At this point, suffice it to say that it depends on limiting the power of administrative agencies.

### (5c)

There remains the argument that bankruptcy proceedings are mostly "administrative" in nature. The court has pointed out that bankruptcy jurisdiction as a whole includes matters that are cases or controversies of the kinds usually decided by courts. The characterization as mostly "administrative" apparently means that bankruptcy courts receive documents that are not complaints, answers, or motions under the rules of civil procedure and enter orders that do not settle disputes between plaintiffs and defendants.

10. "No money shall be drawn from the treasury, but in consequence of appropriations made by law ...." U.S.Const. Art. I, § 9, cl. 7.

11. In *Williams* the Supreme Court reasoned that since the jurisdiction of the Court of Claims could be given to a non-Article III court, then it was not an Article III court. *Glidden* rejected this reasoning as a non sequitur. It also rejected the conclusion that a suit in which the United States is a defendant is not a controversy to which it is a party as contemplated in § 2, cl. 1 of Art. III.

12. In *Bakelite* the Supreme Court had made the same illogical leap it later made in *Williams*. See note 11. The problem suggested by all three cases is that the case or controversy requirement is a difficult-to-apply separation of powers limitation on the kinds of disputes Congress can make into cases or controversies.

A proceeding can be adversarial though the parties are not called plaintiff and defendant and the pleading is not carried out according to the rules of civil procedure. An objection to a creditor's claim is perhaps the most basic adversary proceeding in bankruptcy cases. It determines how much a creditor can receive, and affects other rights to participate in the bankruptcy case. The questions raised are not always simple matters of form. The same can be said of objections to confirmation in chapter 11 or 13 cases. In both situations the proceeding is begun by an "objection", and the parties are not called plaintiff and defendant.

Furthermore, it does not make the court an administrative agency because a dispute between particular opposing parties does not arise in every case, and every order does not settle such a dispute. The so-called "administrative" actions of the court are directed toward the disposition of such disputes. They also settle rights and liabilities between creditors and debtors even though no specific dispute has arisen. In this regard, even entry of the discharge order could be considered merely "administrative." [13]

The argument is best treated as meaning that much of what the bankruptcy courts do could be done by an administrative agency. The court doubts that is true, but even if it is, as the court points out later, it is basically irrelevant.

### (5d)

The court has found no existing rationale for constitutional non-Article III bankruptcy courts. That does not mean the main issue is completely resolved.

Proper treatment requires the court to consider whether the underlying separation of powers and federalism concerns apply to a court whose jurisdiction is limited to bankruptcy cases and related proceedings.

The bankruptcy courts do not have general jurisdiction of federal civil rights, voting rights, or criminal cases. The bankruptcy courts deal primarily with property rights and contract rights. Perhaps they are not as important as individual liberty and rights to participate in the political process. Nevertheless, they are important rights protected by specific provisions of the Constitution. U.S.Const., amends. III, IV, V, & XIV. The drafters of the Constitution recognized that private property rights operate as a restraint on governmental power and must be protected.

Bankruptcy jurisdiction also extends to cases arising under the Bankruptcy Code, such as discharge and dischargeability cases, and to civil cases related to a bankruptcy case. As a result, the bankruptcy courts can have jurisdiction of antitrust cases, securities fraud cases, employment discrimination cases, patent and trademark infringement cases, and admiralty cases, that would otherwise be heard in an Article III court. The court also notes that bankruptcy courts can issue writs of habeas corpus when a debtor is imprisoned pursuant to civil process issued for collection of a debt that is dischargeable or provided for in a plan in a case under chapter 11 or 13. 28 U.S.C. § 2256; Bankruptcy Reform Act §§ 250 & 405(b).

In deciding the question at hand, the court cannot ignore the full extent of bankruptcy jurisdiction. Whether the judge should have constitutional tenure depends partly on what kinds of cases come before him. The court's jurisdiction of a particular case might be denied on constitutional grounds without affecting its jurisdiction of another case, but the judge is the judge for all cases.

The Constitution does not say that Congress or the President can have a greater opportunity to influence the decisions of a federal court in a broad range of cases simply because they arise in the context of bankruptcy. Federalism concerns are even more evident.

It must be remembered that bankruptcy is generally a modification of specific rights

---

**13.** The Bankruptcy Reform Act was intended to take much of the administrative burden from the bankruptcy judge so that he will primarily be involved in hearing disputes between particular parties. See generally 9 Am.Jur.2d, Bankruptcy § 10 at 58 (1980).

and liabilities arising under state law. It is perhaps the severest possible legal modification of contract rights. In this respect, the federal government's legislative power exceeds that allowed to the states. Cf. U.S.Const., Art. I, § 10, cl. 1.

Since bankruptcy statutes modify but do not establish the relevant state created rights and liabilities, the states, by changing their statutes, can resist application of the bankruptcy laws. However, the Supremacy Clause may prohibit the states from making some changes that in effect are attempts to modify the bankruptcy statutes. U.S.Const., Art. VI, cl. 2. This is particularly likely with respect to statutes such as § 522(f) of the Bankruptcy Code, dealing with exemptions. 11 U.S.C. § 522(f). Compare *In re Foster*, 16 B.R. 467, 8 B.C.D. 360 (Bkrtcy.N.D. Ohio 1981) and *In re Redin*, 14 B.R. 727, 8 B.C.D. 332 (Bkrty.Colo.1981).

Bankruptcy statutes in general exert a powerful influence on what state laws can provide in the areas of exemptions and secured transactions. It is also worth noting that in addition to admiralty jurisdiction, a bankruptcy court can have jurisdiction of a case between citizens of the same state and involving primarily state law, if the case is sufficiently related to the bankruptcy case. Consider, for example, a suit brought in the bankruptcy court by a bankruptcy trustee to collect a debt owed to the debtor. Such "non-diversity" cases are generally excluded from federal jurisdiction because of federalism concerns.

Bankruptcy laws are a broad scale federal invasion of areas of the law generally subject to state control. On the other hand, the bankruptcy statutes should be given their intended affect within constitutional limits, despite pressure to unduly limit them or extend them beyond constitutional limits.

It is difficult to see any constitutional justification for having judges without constitutional tenure exercise the decisionmaking power of the bankruptcy courts. The bankruptcy courts decide cases where the concerns behind constitutional tenure apply. The breadth of bankruptcy court jurisdiction by itself calls for constitutional tenure to secure judicial independence. The bankruptcy courts are in the constitutional vortex position in our system of government that is reserved for courts that meet the standards of Article III.

Of course, this might be said with respect to some federal administrative agencies, at least as to some of the cases they decide. They, however, lack the power that would make them constitutional arbiters or political agencies in the sense that the bankruptcy courts are. The bankruptcy courts have not only the opportunity to decide but also the power that makes the concerns behind constitutional tenure apply. This brings the court to the administrative agency problem.

(5e)

The court doubts that the reasons for constitutional tenure strongly apply in many cases and controversies decided by administrative agencies, but admits they apply with respect to some. There is constitutional justification for allowing administrators without constitutional tenure to decide such cases, but the explanation escapes concise statement. The following quotation is a good attempt:

> Moreover, in relying on administrative agencies as precedents for Article I courts, this argument gives inadequate weight to the functional difference between agencies and courts. In establishing administrative agencies pursuant to its power over remedies, Congress has not endowed them with judicial power, which may be defined as the ultimate decision making core of the adjudicative function. The exercise of judicial power encompasses far more than making factual determinations. At its minimum it involves rendering binding decisions on points of law that affect or alter the rights and obligations of parties and establish precedents for future litigants. It also encompasses certain coercive powers, such as the power to render self-executing judgments or to cite for contempt. Administrative agencies possess neither of these attributes. Although they can adjudicate ques-

tions of law, their decisions are not final, but subject to review in Article III courts. Similarly, although agencies can issue coercive orders, they can enforce them only with the aid of an Article III court. Administrative agencies do not, therefore, provide a precedent for broad-scale creation of legislative courts. Finley, Article III Limits on Article I Courts: The Constitutionality of the Bankruptcy Court and the 1979 Magistrate Act, 80 Colum.L.Rev. 560, 578–580 (1980). See also Katz, Federal Legislative Courts, 43 Harv.L.Rev. 894 (1930).

■ The extent of a tribunal's power is a consideration in determining whether the judge should have constitutional tenure. Administrative agencies are not courts in this respect. The court is concerned only with what Congress did, rather than what it might have done. Congress meant to and did give the bankruptcy courts all the essential powers of a court. This is just as true during the transition period as it will be afterward. See 28 U.S.C. §§ 1471, 1475, 1477, 1478, 1479(c), 1480, 1481, 2256; Bankruptcy Reform Act § 405(b); 11 U.S.C. § 105(a). See also 28 U.S.C. § 771–775; Bankruptcy Reform Act § 404(e).[14]

There are two insignificant limitations on the powers of a bankruptcy court. A bankruptcy court cannot punish a criminal contempt that was not committed in the judge's presence or a criminal contempt that warrants a punishment of imprisonment. 28 U.S.C. § 1481; Bankruptcy Reform Act §§ 405(a)(1) & (b). There are similar limitations on the federal district courts. 18 U.S.C. §§ 401, 402, 3691; Fed.R. Crim.Proc. 42.

■ A bankruptcy court cannot enjoin another court. Federal district courts do not have the power to enjoin state courts in every case where general principles of equity would allow it. 28 U.S.C. § 2283; Wright, Miller, & Cooper, Federal Practice and Procedure §§ 2942 & 4221–4226

(1978).[15] Furthermore, even when they can enjoin another court, the district courts may refuse to do so on grounds of comity. Finally, in light of the statutory injunctions and other provisions of the Bankruptcy Code, this is a slight limitation on the powers of the bankruptcy courts. See 11 U.S.C. §§ 350(b), 362, 524; 28 U.S.C. §§ 1471(e), 1478, 2256; Bankruptcy Reform Act § 405(b).

These two limits on the powers of bankruptcy courts were apparently imposed because Congress thought they would reduce the constitutional problems with creating the bankruptcy courts without constitutionally tenured judges. Removing the limits would make it clearer that the bankruptcy courts exercise "the judicial power", but these powers do not define judicial power. Indeed, the denied powers are rather extraordinary powers that may be properly subject to limitations on their exercise.

Thus far the court has not remarked on whether a hearing on confirmation is the kind of proceeding that requires judicial action and cannot be heard in the first instance by executive officers (an administrative agency). See *Den (Murray's Lessee) v. Hoboken Land & Improvement Company*, cited above. The reason should be evident. Even if it is, that does not mean the bankruptcy judge need not have constitutional tenure. A more general inquiry was necessary. Furthermore, the limitations on the powers of the bankruptcy court are not enough to make it justifiable as an administrative agency. It has "the judicial power". Though "the judicial power" may not be constitutionally required for a particular proceeding, the court's actions may nevertheless amount to exercise of "the judicial power". That is the situation in this case. The parties are entitled to have a judge with constitutional tenure exercise the judicial power.

---

**14.** These powers relating to clerks, records, and employees may be said to characterize courts rather than define decisionmaking powers that identify a tribunal as a court.

**15.** The powers denied to the bankruptcy courts are apparently granted to the district courts. Bankruptcy Reform Act § 405(a)(2).

(5f)

■ The court thus comes to the conclusion that the bankruptcy courts should have judges with constitutional tenure. All the jurisdiction of the bankruptcy courts could not be given to non-Article III *courts* under existing rationales. There is no apparent rationale for non-Article III courts for this particular subject matter. The reasons for constitutional tenure are applicable to the business of the bankruptcy courts, and the bankruptcy courts are not administrative agencies. In terms of how "the judicial power" is interpreted to determine whether a court should have judges with constitutional tenure, the analysis can be summarized as follows.

If the court in question decides cases or controversies of a kind described in Article III, then it is exercising "the judicial power" in its elementary sense. That does not mean the court must be an Article III court. Some disputes within the description of Article III, § 2, can be completely disposed of by Congress, the President, or their agents. Whether this is true depends on the specific separation of powers made by the Constitution with respect to the particular dispute or kind of dispute. The Constitution does not give Congress or the President any special power with respect to the decision of cases or controversies of the kinds decided by the bankruptcy courts. It is nevertheless true that Congress has created non-Article III administrative agencies to decide cases and controversies for which the Constitution does not provide any special distribution of decisionmaking power. The difference recognized by Congress and the courts is that the decisionmaking power of administrative agencies is restricted so that they do not completely perform the constitutional, political function of the Article III courts. See generally M. Shapiro, The Supreme Court and Administrative Agencies (1968). On the other hand, the powers of the bankruptcy courts are complete. Thus, the bankruptcy courts exercise

"the judicial power of the United States" in the sense that they must have judges with constitutional tenure.

(5g)

The court cannot leave this subject without disposing of two arguments that did not fit into the narrative so far.

First is the argument that practical concerns can justify the creation of non-Article III courts. As to the bankruptcy courts, it is argued that the volume of business varies with the performance of the economy, and so the number of judges must be variable. This is similar to the argument, that if the territorial courts must be Article III courts, then the United States might have too many courts and judges when the territory becomes a state.[16] *American Insurance Co. v. Carter,* cited above.

The volume of litigation in most Article III courts varies with changing conditions. Furthermore, Congress can control the jurisdiction of the inferior Article III courts. Congress may restrict their jurisdiction though some constitutionally tenured judges are idled. The variability of the volume of business in relation to the number of judges is also a problem whenever Congress creates an Article III court.

Practical concerns should guide the courts in interpretation of the Constitution but not to the point of overriding its fundamental limitations. There is no principle of constitutional law that allows Congress to create a court without regard to Article III whenever the nature of the court's subject matter jurisdiction gives rise to practical reasons for having judges without constitutional tenure. There are other ways, primarily the creation of administrative agencies, to avoid this problem without testing the limits of Article III.

As to the non-Article III military courts and courts in the territories and the District of Columbia, the Constitution recognizes practical problems as to the *form of government* that justify the creation of non-Article III federal courts. Except for those

---

16. This appears to be a straw man argument. The problem should not exist at least with respect to courts in territories that become

states. Of course Congress should not be able to abolish an Article III court solely for the purpose of removing the judge.

practical concerns, the argument must be considered a makeweight, despite the Supreme Court's continued reliance. See *Palmore v. United States*, cited above; *Glidden v. Zdanok*, cited above.

In the second argument the trustee attempts to classify bankruptcy cases as among those justiciable in Article III or non-Article III courts. The argument is not based on Congress's power to decide or control the decision in any particular disputes arising in bankruptcy cases. It is based on Congress's power to pass bankruptcy statutes.

In *Schumacher v. Beeler*, the Supreme Court was concerned with a case in the federal district court between a bankruptcy trustee and an adverse claimant of property. There was no attempt to prove diversity jurisdiction or jurisdiction (in rem) based on the court's control of the property in question. 293 U.S. 367, 55 S.Ct. 230, 79 L.Ed. 433 (1934). When a federal court lacked control of the property, § 23b of the Bankruptcy Act allowed jurisdiction if it would have had jurisdiction regardless of the bankruptcy case or if the adverse claimant consented. The Supreme Court said:

> The congress, by virtue of its constitutional authority over bankruptcies ... could confer or withhold jurisdiction to entertain such suits and could prescribe the condition on which the federal courts should have jurisdiction.

293 U.S. 374, 55 S.Ct. 233.

This suggests that Congress can constitutionally confer jurisdiction of such cases on non-Article III federal courts only because of its "constitutional authority over bankruptcies". See also *Williams v. Austrian*, 331 U.S. 642, 67 S.Ct. 1443, 91 L.Ed. 1718 (1947). The quotation must be read in light of the unclearly stated premise of the opinion, that the case in question was a case arising under a federal statute within the meaning of Article III and constitutionally could be heard in the Article III courts.[17]

The point of the quotation is that the Constitution does not require Congress to give the lower federal courts jurisdiction of every case or controversy justiciable in an Article III court. Furthermore, for such cases Congress can impose consent as a prerequisite to jurisdiction or use it as a ground of statutory jurisdiction. The question was not whether the Constitution allowed federal jurisdiction, but whether Congress could condition it on consent.

The reference to Congress's "constitutional authority over bankruptcies" could be read as a misstatement, since the relevant power was Congress's power to control jurisdiction of the lower Article III courts. Or, the Supreme Court could have meant that such cases should be considered cases arising under a federal statute because of the broad constitutional scope of bankruptcy statutes.[18] Perhaps the Supreme Court meant only to state the obvious, that Congress's power to pass the jurisdictional statute was part of its general power to pass statutes on the subject of bankruptcy.

It is certain the Supreme Court did not mean to say what the trustee says, which is what three justices said in *National Mutual Insurance Co. v. Tidewater Transfer Co.*, 337 U.S. 582, 69 S.Ct. 1173, 93 L.Ed. 1556 (1949).

In the *Tidewater* case, Justice Jackson argued that Congress can constitutionally impose on the Article III courts jurisdiction of cases not of a kind described in Article III. As an example, he said non-diversity cases brought by bankruptcy trustees but involving only questions of state law are not cases arising under a federal statute, yet they can be heard in the Article III courts. The argument was based on misreading the *Schumacher* and *Austrian* cases in the same way that the trustee has misread them.

---

17. The premise was probably unclearly stated because the Supreme Court had not clearly decided the issue. Note, Bankruptcy and the Limits of Federal Jurisdiction, 95 Harv.L.Rev. 703, 711 713 (1982).

18. If bankruptcy can include a complete wrapping up of the debtor's financial affairs, then *most* related cases are merely disputes arising under the bankruptcy statutes.

Justice Jackson's argument and example were rejected by six justices. The argument is so obviously wrong it is difficult to refute. By passing statutes, Congress can create cases arising under federal statutes, but it cannot add to the descriptions of Article III, § 2, cl. 1. The trustee argues that all bankruptcy matters generally are within the class of cases for which Justice Jackson argued in *Tidewater.* The majority of the Supreme Court clearly rejected the notion that such a class of cases exists.

(6)

The court has decided that the bankruptcy judges should have constitutional tenure. The court turns now to the question of whether the relationship between the bankruptcy courts and the federal district court makes it constitutional for the bankruptcy judges to exercise "the judicial power" though they lack constitutional tenure.

The trustee argues that the right to appeal to an Article III court is all that is required. In other words, even if all the considerations underlying the standards of Article III apply to the lower court, it need not meet those standards so long as there is a right to appeal to an Article III court.

█ This essentially follows the argument that since Congress need not create lower Article III courts and can let the state courts decide, then non-Article III federal courts are always constitutional. The court has already pointed out the fallacy of that argument. Moreover, if a judge with constitutional tenure is required because of the function and political place of the court, it does not matter that there are Article III courts to hear appeals from its decisions. Section 1 of Article III explicitly requires that the judges of any federal court, at whatever level, have constitutional tenure if the court exercises "the judicial power".

The trustee also argues that decisions by a bankruptcy court are subject to a "de novo determination" by the federal district court in the same district. *United States v. Raddatz,* 447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980). In *Raddatz,* the district judge referred a motion to suppress evidence in a criminal case to the magistrate. The magistrate heard the evidence, made findings of fact, and recommended to the district judge that the motion be denied. The district judge reviewed the transcript of the hearing, the magistrate's report, and the pleadings and memoranda filed by the parties. He denied the motion without hearing the witnesses. The Supreme Court held the procedure was constitutional despite Article III problems:

> Thus, although the statute permits the district court to give to the magistrate's proposed findings of fact and recommendations "such weight as [their] merit commands and the sound discretion of the judge warrants" ... that delegation does not violate Art. III so long as the ultimate decision is made by the judge.

100 S.Ct. 2416.

It is evident what the Supreme Court meant by a "de novo determination". The district judge is not bound to give any particular weight to the magistrate's findings of fact. He is not required to accept them even if supported by substantial evidence in the record. Furthermore, if he is dissatisfied with the record, he can hear the witnesses himself or require the magistrate to hold another hearing. That decision is in his "sound discretion".

On the other hand, the district court, as an appellate court for decisions of the bankruptcy court, must accept its findings of fact unless clearly erroneous. Bankruptcy Reform Act § 405(a) & (d); Bankruptcy Rule 801. Obviously, this denies the district judge the right to make a "de novo determination" within the meaning of *Raddatz.*[19]

It does not help the argument to refer to administrative agency fact-finding. With regard to them, it is first necessary to identify the Article III problem.

---

**19.** By agreement parties may appeal directly to the court of appeals. 28 U.S.C. § 1293; Bankruptcy Reform Act §§ 236 & 405(c)(2).

The problem is not with taking away jurisdiction or functions that *could* be performed by an Article III court. The problem is with giving "the judicial power" to non-Article III administrative agencies. There is no problem when the agency is legislating or performing functions reserved to the executive branch. There is less of a problem when the agency is deciding only cases or controversies that could, under existing rationales, be decided by a non-Article III court. The problem is most apparent when the agency decides cases or controversies that could be decided by an Article III court but not by a non-Article III federal court. When it finds the facts, an executive agency is performing part of the function that *in the federal government* appears to be reserved to the judiciary branch. It is a separation of powers problem.[20]

It is easy to see that fact-finding is not a complete exercise of the judicial power but only one step in the process leading to its exercise. The scope of judicial review of the facts must vary with the constitutional importance of the issues to which they are relevant.[21] For especially important "political rights", the lower Article III courts or the Supreme Court are more likely to hold that judicial review of the findings of fact is not only constitutionally required but must have a broad scope. For some cases, it might even be held that the fact-finding function cannot be given to executive agencies, or if it can, the findings can be given little weight or binding effect in the Article III courts.[22]

It should be apparent that for many issues decided by administrative agencies, a narrow scope of review of their findings of fact is justified. Furthermore, the necessary scope of judicial review as a constitu-

tional separation of powers limitation on agency fact-finding can be determined by the Article III courts only as cases come from the administrative agencies. For any particular case or issue, it is extremely difficult to say to what extent administrative agency fact-finding by itself intrudes on the sphere of action reserved to the judicial branch of the federal government.

It is not a problem in this case. The bankruptcy courts are not administrative agencies. It is irrelevant that the court's findings of fact might have the same effect if it was an agency. If it was an agency, its power would be limited to the extent necessary to deprive it of "the judicial power". That is not the case. When a bankruptcy court finds the facts, it is exercising "the judicial power".

The trustee's final argument is based on the relationship between the district court and the bankruptcy court for the same district. It is a continuation of the *Raddatz* argument on a broader scale. The idea is that the bankruptcy court is sufficiently within the control of the district court that the district judge is a constitutionally tenured judge for the bankruptcy court. The idea is expressed in the following quotation from Justice Blackmun's concurring opinion in *Raddatz*:

> [T]he handling of suppression motions invariably remains completely in the control of the federal district court. The judge may initially decline to refer any matter to a magistrate. When a matter is referred, the judge may freely reject the magistrate's recommendation. He may rehear the evidence in whole or in part. He may call for additional findings or otherwise "recommit the matter to the

---

**20.** "It is rather the question of the appropriate maintenance of the federal judicial power in requiring the observance of constitutional restrictions. It is the question whether the Congress may substitute for constitutional courts ... an administrative agency ... for the final determination of the facts upon which the enforcement of the constitutional rights of the citizens depend." *Crowell v. Benson*, 285 U.S. 22, 56-57, 52 S.Ct. 285, 294-95, 76 L.Ed. 598 (1931).

**21.** The much vaunted change in the law since *Crowell v. Benson*, has taken place with respect to this part of the question.

**22.** Consider to what extent an administrative agency could be given the power to find the facts regarding a motion to suppress evidence in a federal criminal prosecution or regarding a claim of denial of equal protection by a state's peculiar voting rights statutes.

456

magistrate with instructions." [Citation omitted.] Moreover, the magistrate himself is subject to the Art. III judge's control. Magistrates are appointed by district judges ... and subject to removal by them .... In addition, district judges retain plenary authority over when, what, and how many pretrial matters are assigned to magistrates .... Thus, the only conceivable danger of a "threat" to the "independence" of the magistrate comes from within, rather than without, the judicial department. ... Even assuming that, despite these protections, a controversial matter might be delegated to a magistrate who is susceptible to outside pressures, the District Judge—insulated by life tenure and irreducible salary—is waiting in the wings, fully able to correct errors. Under these circumstances, I simply do not perceive the threat to the judicial power or the independence of judicial decision-making that underlies Art. III. We do not face a procedure under which "Congress [has] delegate[d] to a non-Art. III judge the authority to make final determinations on issues of fact." ... Rather, we confront a procedure under which Congress has vested in Art. III judges the discretionary power to delegate certain functions to competent and impartial assistants, while ensuring that the judges retain complete supervisory control over the assistants' activities.

100 S.Ct. 2417–2418.

Generally, there are two kinds of connections that taken together could make the district judge the judge of the bankruptcy court for Article III purposes. One is personal supervisory power over the bankruptcy judge and the bankruptcy court. By far the more important kind of connection is the ability to exercise judicial power in bankruptcy cases and civil proceedings in the bankruptcy court.

The subject matter jurisdiction exercised by the bankruptcy courts in cases under the Bankruptcy Code is vested in the district courts with the bankruptcy courts as "separate departments" of the district courts. 28

U.S.C. § 1471; Bankruptcy Reform Act §§ 404(a) & 405(b).

This does not mean the district court has any judicial power it can exercise in a bankruptcy case or civil proceeding pending in the bankruptcy court. The statutes leave little doubt that the district judge has practically no power to issue orders in a bankruptcy case or civil proceeding pending in the bankruptcy court. Section 1471(c) of 28 U.S.C. provides:

The bankruptcy court for the district in which a case under title 11 is commenced shall exercise all of the jurisdiction conferred by this section on the district courts.

This does not directly say the district courts are prohibited from exercising any of the jurisdiction given them, but the legislative history makes it clear that this section was intended to have that effect with respect to almost all bankruptcy jurisdiction.

The Senate was opposed to the creation of Article III bankruptcy courts and ultimately prevailed. Its version of subsection (c) said that the bankruptcy courts "may" exercise the jurisdiction given to the district courts. The report of the Senate Judiciary Committee explained:

The use of the term "may" in this section is not intended to imply that the district court has any discretion whatsoever in withholding bankruptcy cases or civil proceedings arising under title 11 or arising under or related to a case under title 11 from the bankruptcy court .... It is the intent of these provisions that the bankruptcy court will receive and the bankruptcy judge will handle cases and proceedings under title 11, and that all actions filed under [§ 1471(b) ] ... will be automatically referred to the bankruptcy judge. It is contemplated that the rules of Bankruptcy Procedure will be adopted to carry out this intent in order that the bankruptcy judge shall exercise the full range of jurisdiction in bankruptcy cases and proceedings ... [T]he district judge will be expected to act in title 11 cases only in limited instances (1) where it is necessary to enjoin a State or Federal

court or (2) to punish a person for contempt by imprisonment or by a fine of more than $1,000. Otherwise, the district judge will function only as an appellate judge in bankruptcy matters . . . .

S.Rep.No. 95–989, 95th Cong., 2d Sess. 154 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5940.

In an attempted compromise vesting jurisdiction in the courts of appeal, the House used "shall" instead of "may". The bill as finally enacted was the House's suggested compromise amended to substitute "district courts" in all the relevant provisions that had referred to the courts of appeal. 1 Collier on Bankruptcy ¶ 1.03[5] at 1–50—1–53.[23] Certainly, the word "shall" is a better expression of what the Senate intended by using "may".

Except on appeal, the district court's jurisdiction gives the district judge only those powers denied to the bankruptcy court—the power to punish some criminal contempts and the power to enjoin another court. Section 405(a)(2) of the Bankruptcy Reform Act apparently reserves those powers to the district court but does not give it any general powers. The grant of jurisdiction to the district courts is meaningless except for the contempt and injunctive powers reserved to the district judge.

The district judge's lack of power to act in bankruptcy proceedings practically answers the question. He lacks the ultimate decisionmaking power. He lacks control of the decisionmaking process except in the role of appellate judge. The court has already rejected the argument that the right to appeal to an Article III court solves the constitutional problem. Likewise, the district judge's power as an appellate judge does not give him sufficient control of the bankruptcy court's judicial power to make him a constitutionally tenured judge for the bankruptcy court.

In light of the dearth of decisionmaking power in the district court, it is difficult to see how giving the district judge personal supervisory power over the bankruptcy judge would make a constitutional difference. During the transition period the district judges retain some of the power they had under the Bankruptcy Act. *New* bankruptcy judges must still be appointed by the judge or judges of the district court. Likewise, removal for cause is still within the power of the district judge or judges. Bankruptcy Reform Act § 404(b) & (d); Bankruptcy Act § 34. 11 U.S.C. § 62.

The fact that a new bankruptcy judge "owes" his appointment to the district judge is not likely to induce in him a feeling of dependence or need for approval of his actions, since the power to reappoint will be in the President. Bankruptcy Reform Act § 201 (28 U.S.C. § 152); § 402(b); § 404(b)–(d). In any event, the appointment power can only affect *new* bankruptcy judges.

Thus, it is the power to remove that must be the main source of supervisory power in the district judge. Included in the causes for removal are incompetency and neglect of duty. A district judge might urge these grounds for removal of a bankruptcy judge whose decisions he disagreed with. Such an action would be uncharacteristic of district judges. Removal cannot be carried out immediately and is a dire remedy not likely to be often threatened. Furthermore, over the years the district courts and judges have sought to decrease their involvement in bankruptcy matters. H.R.Rep.No. 95–595, 95th Cong., 1st Sess. 14 (1977). The court does not believe the removal power gives the district judge the kind of day-to-day supervisory power that makes for control of the decisionmaking processes of the bankruptcy court.

As to the day to day operation of the bankruptcy court, it has been separated from the district court and freed from con-

---

**23.** "It was thus perfectly plain from section 1471 . . . added . . . by this amendment to H.R. 8200, that the bankruptcy courts, though adjuncts of the courts of appeals, were to be the repositories for the exercise of all of the judi-

cial functions flowing from the conferral of that jurisdiction, and the bankruptcy court was to exercise all of this jurisdiction through its judicial officers." Id. at 1 53.

trol by the district judge. Bankruptcy Reform Act § 404(e) & (f).

The trustee has attempted to bolster this argument by saying that the court system under the Bankruptcy Act had evolved to practically the same point, yet that system was constitutional.

The trustee has not pointed out any case that held it was constitutional. Furthermore, though the degree of connection between the district court and the bankruptcy court was unclear under the Bankruptcy Act and Rules of Procedure, the severance of all connections is apparent under the Bankruptcy Code and accompanying amendments to 28 U.S.C. It is only during the transition period that a few connections remain, and they are not enough to support the trustee's argument that the bankruptcy courts are merely subordinate agents of the district courts subject to the supervision and control of the district judges.

The court thus comes to the final conclusion that there is no constitutional justification for having judges without constitutional tenure exercise the powers of the bankruptcy courts. It is basic to our system of government and to our freedom that Congress conform to Article III of our Constitution. It has not done so.[24]

### Conclusion

The transition statutes show Congress's intent to postpone until 1984 a complete break from the court system that existed under the Bankruptcy Act. Bankruptcy Reform Act § 404(a); Bankruptcy Act §§ 1(10) & 2(a), 11 U.S.C. §§ 1 & 11. The bankruptcy courts could have been made sufficiently dependent on the district courts that there would be no constitutional problem, but Congress failed to follow that course. The jurisdiction and transition statutes that make the bankruptcy courts

essentially independent of the district courts result in vesting "the judicial power" in courts without constitutionally tenured judges.[25] See especially 28 U.S.C. § 1471(c). The jurisdiction of the bankruptcy court cannot be constitutionally exercised by the bankruptcy judge.

The case must be dismissed. However, there are no other federal courts with the statutory authority or the time and resources necessary to handle bankruptcy cases. The order of dismissal will be stayed pending a final appellate decision in this case.

This memorandum constitutes findings of fact and conclusions of law. Bankruptcy Rule 752.

24. The same conclusion has been reached with respect to bankruptcy court jurisdiction of civil proceedings related to a bankruptcy case. The decision is now before the Supreme Court for review. *Marathon Pipeline Company v. Northern Pipeline Construction Co.*, 12 B.R. 946, 7 B.C.D. 1373, 5 C.B.C.2d 114 (1981).

25. The power of appointment is vested in the President at the end of the transition period. Giving the executive branch the power of appointment will make the system even more objectionable under Article III. The court being unconstitutional will expire on March 31, 1984 and all pending cases will be taken over by the district courts.